### A10A1193. CAPITOL INFRASTRUCTURE, LLC
### v. THE PLAZA MIDTOWN RESIDENTIAL CONDOMINIUM ASSOCIATION, INC.
#### (702 SE2d 910)

PHIPPS, Presiding Judge.

The Plaza Midtown Residential Condominium Association, Inc. petitioned the superior court for a declaratory judgment against Capitol Infrastructure, LLC, on the issue of whether the Association could terminate, pursuant to OCGA § 44-3-101 (c), certain telecommunications contracts. That Code provision allows for termination under certain circumstances, but only before the expiration of a specified 12-month period:

> . . . [A]ny management contract, any lease of recreational area or facilities, or any other contract or lease executed by or on behalf of the association during the period of the declarant's right to control the association pursuant to subsection (a) of this Code section shall be subject to cancellation and termination *at any time during the 12 months following the expiration of such control period* by the affirmative vote of the unit owners of units to which a majority of the votes in the association pertain. . . .[1]

Here, that 12-month period expired without the Association having terminated any such telecommunications contract, rendering the issue moot. Nevertheless, the superior court issued a declaratory judgment that, under that Code provision, those contracts remained subject to termination by the Association. Because the declaratory judgment upon a moot issue was not authorized, we vacate that order and remand the case for proceedings not inconsistent with this opinion.

The relevant facts are not in dispute. On July 13, 2005, the Plaza Midtown Property, LLC, which was developing a residential condominium community named "The Plaza Midtown Residential Condominium," entered into a "Master Community Infrastructure Agree-

---

[1] OCGA § 44-3-101 (c) (emphasis supplied).

ment" (hereinafter, "Agreement") with Capitol Infrastructure, LLC for Capitol to install telecommunications infrastructure "on easements provided" for the condominium community. The anticipated infrastructure included internal and external wiring, conduit, security alarm sensors, and equipment that would enable the community to be served with voice, video, data, internet, security, and other services. Capitol was in the business of *installing* (at its own cost) infrastructure, but not subsequently providing the telecommunications services. Rather (to recoup its installation costs and make a profit), it would arrange for third parties to furnish such services to the condominium community and lease or license to those third-party providers the infrastructure it had installed.

The Agreement stated in its Term paragraph: "The initial term of this Agreement commences on the date of this Agreement and, *subject to OCGA § 44-3-101*, continues for 12 years after the date on which the first certificate of occupancy is issued for a residence in the Condominium."[2] Accordingly, an "easement and memorandum of [a]greement" was recorded in the county court records, and Capitol installed a telecommunications infrastructure at The Plaza Midtown Residential Condominium.

It is uncontroverted that in December 2005, Plaza Midtown Property, LLC, as declarant, recorded in the county court records a condominium declaration for The Plaza Midtown Residential Condominium.[3] That same month, (appellee) Plaza Midtown Residential Condominium Association, Inc. was formed; it was comprised of condominium unit owners and was controlled by Plaza Midtown Property, LLC.[4]

Also that month, several telecommunications agreements were entered into. The Association executed with Capitol a "Service Provider Designation Agreement," which expressly acknowledged the Agreement. The "Service Provider Designation Agreement" allowed Capitol, among other things, to serve as the "exclusive agent" to negotiate and enter into "bulk service agreements" on behalf of the Association with third-party providers of telecommunications services. Capitol, in turn, negotiated such contracts for third parties to provide telecommunications services to members of the Association. And those third-party providers subsequently entered into contracts with the Association for various telecommunications services for its residents.

---

[2] (Emphasis supplied.)

[3] See generally OCGA § 44-3-74.

[4] See OCGA § 44-3-101 (a).

In early August 2006, Plaza Midtown Property, LLC surrendered its control of the Association.[5] By that time, condominium unit owners were becoming dissatisfied with aspects of the telecommunications services being provided to them.

In April 2007, the Association filed in superior court a petition seeking a declaratory judgment that the Agreement was subject to OCGA § 44-3-101 (c) such that it could be terminated thereunder. Numerous filings ensued, including the following. Both the Association and Capitol filed a motion for summary judgment, each arguing its position regarding whether the Code provision allowed for termination. Thereafter, in October 2007, the Association filed an "amended petition for declaratory judgment," wherein it sought to add to its case: (i) a breach of contract count against Capitol for deficient performance, and (ii) a request for a declaratory judgment that the easement granted to Capitol was "a personal obligation of the [Plaza Midtown Property, LLC] that [did] not transfer to [the Association]." Capitol responded with a motion to strike that pleading. In November 2007, the Association filed a motion to add as defendants third-party providers of telecommunications services. Capitol opposed that motion.

The superior court conducted a hearing in April 2008, at which the parties argued, among other things, their respective positions on whether OCGA § 44-3-101 (c) allowed for termination. The Association asserted that the Agreement had been entered into on its behalf and that the plain language within the Term paragraph of the Agreement demonstrated that, as a matter of law, the Agreement was subject to OCGA § 44-3-101 (c) and thus could be terminated thereunder. Capitol countered, among its arguments, that the issue of whether the Agreement could be terminated under OCGA § 44-3-101 (c) was moot. It asserted that, even if the Association might have once been authorized to terminate the Agreement under that Code provision, it undisputedly had not done so within the statutory 12-month period, which had ended on August 1, 2007.

The Association's counsel acknowledged, "[W]e had until August 1st to terminate this thing. But before we did, we wanted to know does this Code section apply." The Association's counsel further outlined to the court what actions the Association *had* taken prior to August 1. As the record supports, during May and June 2007, the Association sent to condominium unit owners forms upon which to vote whether to terminate the Agreement, the Service Provider Designation Agreement, and "any and all other related contracts." Then, having received what it determined to be the

---

[5] See OCGA § 44-3-101 (a) (4).

requisite number of approval votes, the Association informed Capitol and third-party providers of telecommunications services by letters in late July 2007 that it was conditionally terminating the contracts. These actions were taken, the Association's counsel explained, because "we knew that August 1st [2007] was going to come and go." Counsel further pointed out that the Association's bylaws required a final step before a requisite number of procured votes could effect a decision by the Association and that the Association had purposefully not completed that step. The lawyer explained:

> Had we [done so], . . . that would have terminated the contract. . . . We would have terminated the contract and been subject to breach and damages and not be able to get our own service providers. . . . So we conditionally terminated all the agreements and said we'll just wait for the Court to rule on this.

In August 2009, three years after Plaza Midtown Property, LLC surrendered control of the Association, the superior court entered an order in favor of the Association. Therein, the court stated that the plain language of the Agreement showed that it was subject to OCGA § 44-3-101. Further, the court noted, the Association had advised Capitol and third-party service providers of its intent to terminate the Agreement and the related contracts, but had refrained from finalizing the termination procedures prior to obtaining a declaratory judgment that it was entitled to do so under OCGA § 44-3-101. Thus, the court declared that the Agreement and "all contracts flowing from the Agreement, are subject to termination by the Association pursuant to OCGA § 44-3-101."[6] It allowed the Association 30 days within which to send notices of termination of the Agreement and all contracts flowing therefrom. Regarding other outstanding matters, the court ruled that Capitol's motion to strike the Association's amendment was moot; it did not reach the counts alleged in the Association's amendment; nor did it reach the Association's motion to add parties.

1. Capitol contends that the superior court's declaratory judgment that the Association could terminate the Agreement "and all

---

[6] We construe the superior court's order, captioned "Order on Plaintiff's Motion for Summary Judgment," as a declaratory judgment. "The distinctive characteristic of a declaratory judgment is that the declaration stands by itself and does not seek execution or performance by the defendant. Ordinary judgments, on the other hand, grant consequential or curative relief in some form." *Kirkland v. Morris*, 233 Ga. 597, 598 (212 SE2d 781) (1975) (citations omitted). "Because the superior court's decision was based upon the application of the law to [undisputed] facts, we apply a de novo standard of review." *Dept. of Revenue v. Sledge*, 241 Ga. App. 833 (528 SE2d 260) (2000) (citations omitted).

contracts flowing from it" under OCGA § 44-3-101 was an impermissible advisory opinion. Capitol maintains that the Association did not terminate any such contract within the time period allowed by that statute and that the superior court's effective enlargement of the statutory period was not authorized. We agree.

The purpose of the Declaratory Judgment Act is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; [it] is to be liberally construed and administered."[7] Under the Declaratory Judgment Act,

> [t]he superior court is authorized to enter a declaratory judgment upon petition therefor in cases of actual controversy, and to determine and settle by declaration any justiciable controversy of a civil nature where it appears to the court that the ends of justice require that such should be made for the guidance and protection of the petitioner, and when such a declaration will relieve the petitioner from uncertainty and insecurity with respect to his rights, status, and legal relations. *However, no declaratory judgment may be obtained which is merely advisory, or fruitless, or which merely answers a moot or abstract question.*[8]

Assuming, without deciding, that a declaratory judgment was authorized at the outset on the issue of whether OCGA § 44-3-101 (c) would permit the Association to terminate the Agreement and related contracts, by the time the superior court declared judgment on that issue, it was unquestionably moot.

The plain language of OCGA § 44-3-101 (c) provides that certain agreements executed by or on behalf of an association during the period of the declarant's right to control the association pursuant to OCGA § 44-3-101 (a) "shall be subject to cancellation and termination at any time during the 12 months following the expiration of such control period." The Association has consistently maintained that it intentionally neither canceled nor terminated the agreements at issue, but chose to await a declaratory judgment from the superior court. By the time the superior court issued the anticipated declaratory judgment, the 12-month statutory period of OCGA § 44-3-101 (c) had expired.

---

[7] OCGA § 9-4-1.

[8] *Baker v. City of Marietta*, 271 Ga. 210, 213-214 (1) (518 SE2d 879) (1999) (citations and punctuation omitted; emphasis supplied); see OCGA § 9-4-2 (a) (providing, in pertinent part, "In cases of *actual controversy*, the respective superior courts of this state shall have power, upon petition or other appropriate pleading, to declare rights and other legal relations of any interested party petitioning for such declaration.") (citations and punctuation omitted; emphasis supplied).

When the 12-month period expired, any right the Association might have had to cancel and terminate contracts under OCGA § 44-3-101 (c) also expired. Thereafter, the Association faced *no* uncertainty regarding whether that Code provision allowed it to terminate the contracts at issue.

Regardless of when an action reaches the point that it no longer presents a justiciable controversy and presents only a question of academic interest, when it reaches that point, the entry of a declaratory judgment is not appropriate because a court has no province to . . . give advisory opinions.[9]

Where, as here, a

party seeking declaratory judgment does not show it is in a position of uncertainty as to an alleged right, dismissal of the declaratory judgment action is proper; otherwise, the trial court will be issuing an advisory opinion, and the Declaratory Judgment Act makes no provision for a judgment that would be advisory.[10]

Entry of a declaratory judgment under such circumstances is an erroneous advisory opinion and must be vacated.[11]

In so concluding, we have rejected the Association's assertion that its actions of procuring votes to terminate the Agreement and related contracts and then "conditionally" terminating them were timely and sufficient so as to trigger the protections of OCGA § 44-3-101 (c). More specifically, the Association points to evidence that it claims shows that in July 2007, which was within 12 months of the declarant's surrender of its control of the Association, it (the Association) obtained the requisite number of votes to terminate the contracts. But even if true, which Capitol disputes, the Association concedes in its brief to this court that "due to the fact that no declaratory judgment had been entered by the trial court to guide the Association in its uncertainty," it "did not finalize that vote and *terminate* the Agreement."[12] What the Association did instead was send a letter to Capitol that pertinently stated:

Due to recent events and the postponement of the hearing in the [case below], the Association wants to further clarify

---

[9] *Baker*, supra at 214-215 (citations and punctuation omitted).

[10] Id. at 214 (citation and punctuation omitted).

[11] Id. at 215.

[12] (Emphasis in original.)

> its position as set forth in its Petition for Declaratory Judgment that it is terminating the Master Community Infrastructure Agreement (the "Agreement") *conditional* upon the judge's ruling on its Petition. The Petition and this correspondence puts your client on notice of such termination *only* if the Court rules that the Agreement is subject to OCGA § 44-3-101 (c). Obviously, if the judgment ultimately rules against the Association and determines that the Agreement is not subject to OCGA § 44-3-101 (c), then the Agreement is not terminated.[13]

And it sent letters with similar conditional language to third-party providers of telecommunications services.

But nothing in OCGA § 44-3-101 (c) permits any such "conditional termination" — one which may ripen eventually, upon which termination would be effective as of some prior date. Had the General Assembly intended to allow for such circumstance, it could have so provided. The plain and unambiguous language of the Code provision, however, shows that it did not. The "best indicator of the General Assembly's intent is the statutory text it actually adopted,"[14] and where, as here, "the statutory language is clear and does not lead to an unreasonable or absurd result, it is the sole evidence of the ultimate legislative intent."[15]

Furthermore, the Association has cited no authority that filing a declaratory judgment petition tolls, enlarges, or otherwise nullifies the limited time period expressly prescribed in OCGA § 44-3-101 (c), and we find none. Notably, the Supreme Court of Georgia has held that the "Declaratory Judgments Act . . . does not nullify statutes of limitations."[16] And although the time limitation in OCGA § 44-3-101 (c) is not a statute of limitation,[17] it serves an analogous function in that it establishes a limited period beyond which an association loses its right thereunder to terminate contracts.

---

[13] (Emphases in original.)

[14] *Chase v. State*, 285 Ga. 693, 699 (2) (681 SE2d 116) (2009).

[15] *Shorter College v. Baptist Convention of Ga.*, 279 Ga. 466, 470 (1) (614 SE2d 37) (2005) (citations and punctuation omitted); *Early v. Early*, 269 Ga. 415, 416 (499 SE2d 329) (1998) ("In construing a statute, the determining factor is the intent of the legislature and we look first to the words of the statute to determine what that intent was and if those words be plain and unambiguous and the intent may be clearly gathered therefrom, we need look no further in determining what that intent was.") (citation and punctuation omitted).

[16] *Bingham v. C&S Nat. Bank*, 205 Ga. 285, 288 (53 SE2d 288) (1949).

[17] See *Young v. Williams*, 274 Ga. 845, 848 (560 SE2d 690) (2002) (statute of limitation has as its purpose "the limiting of the time period in which an action may be brought, thereby providing a date certain after which potential defendants can no longer be held liable for claims brought on such actions") (citation omitted).

The record makes it clear that the Association's chosen strategy was to refrain from terminating any contract at issue until after the superior court issued a declaratory judgment on its petition. Meanwhile, the time period allotted to do so under OCGA § 44-3-101 (c) ran. And where the issue is thus moot, *"dismissal* of the declaratory judgment action is proper."[18] We vacate the superior court's order and remand for proceedings not inconsistent with this opinion.

2. In light of our holding in Division 1, we need not reach Capitol's remaining claims of error.

*Judgment vacated and case remanded with direction. Miller, C. J., and Johnson, J., concur.*

DECIDED NOVEMBER 16, 2010 — 

*Greenberg Traurig, Ernest L. Greer, Michael J. King*, for appellant.

*Lueder, Larkin & Hunter, John T. Lueder, Brendan R. Hunter*, for appellee.

---

[18] *Baker*, supra at 214 (citation omitted; emphasis supplied).