**FOURTH DIVISION**
**DILLARD, P. J.,**
**RAY and SELF, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 9, 2017**

# In the Court of Appeals of Georgia

A17A0384. WALKER et al. v. OGLETHORPE POWER
      CORPORATION et al.

A17A0385. SHAPIRO et al. v. OGLETHORPE POWER
      CORPORATION et al.

DILLARD, Presiding Judge.

This consolidated appeal arises from two class actions brought on behalf of former and current members of various electric-membership corporations ("EMCs"), which are private, nonprofit, electric utilities owned by the members they serve. In Case No. A17A0384, former EMC members sued Oglethorpe Power Company ("Oglethorpe"), Georgia Transmission Corporation ("GTC"), Walton EMC, Jackson EMC, and Sawnee EMC, raising numerous claims, all of which were based, at least in part, on their assertion that they were entitled to refunds from the defendant EMCs

of "patronage capital."[1] Similarly, in Case No. A17A0385, current EMC members sued the same parties (except for Sawnee EMC), raising a variety of claims that were also generally based on their assertion that they were entitled to a refunds of patronage capital from the defendant EMCs. Ultimately, in separate orders, the trial court dismissed both complaints for several reasons, including lack of standing and failure to state a claim.

In Case No. A17A0384, former members of the Walton, Jackson, and Sawnee EMCs appeal the trial court's dismissal of their complaint, arguing that the court erred by (1) applying the wrong legal standard applicable to a motion to dismiss; (2) finding that the plaintiffs lacked standing; (3) finding that the plaintiffs' claims were time-barred; (4) concluding that the defendants have no obligation under any circumstances to refund patronage capital to their members; (5) finding that the plaintiffs failed to state claims for breach of contract, unjust enrichment, money had and received, conversion, and equitable relief; and (6) applying the filed-rate doctrine.

---

[1] Patronage capital consists of earnings in excess of each EMC's operating costs and expenses that are allocated on each EMC's books to its members. Patronage Capital also referred to as "capital credits" throughout the record, the parties' briefs, and this opinion.

Similarly, in Case No. A17A0385, current members of the Walton and Jackson EMCs appeal the trial court's dismissal of their complaint, arguing that the trial court erred by finding that (1) they lacked standing; (2) the EMC defendants have absolute discretion to never retire patronage capital, except upon dissolution; (3) the plaintiffs failed to state claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, money had and received, conversion, and conspiracy; (4) the plaintiffs' request for declaratory and injunctive relief was improper; and (5) the plaintiffs' claims against certain EMCs were derivative instead of direct. For the reasons set forth *infra*, we affirm the trial court's dismissal orders in both cases.

As conceded by the current and former EMC members, the facts necessary to resolve these consolidated appeals are essentially undisputed.[2] The Jackson, Walton,

---

[2] During a March 17, 2016 hearing, counsel, speaking on behalf of both plaintiff classes, confirmed to the trial court that there were "no actual facts in dispute." Instead, counsel explained, this is "a dispute over what the law[ ] requires with respect to the capital credit." Nevertheless, we note that, "[i]n ruling on a motion to dismiss, the trial court must accept as true all well-pled material allegations in the complaint and must resolve any doubts in favor of the plaintiff." *Wright v. Waterberg Big Game Hunting Lodge Otjahewita (PTY), Ltd.*, 330 Ga. App. 508, 509 (767 SE2d 513) (2014) (punctuation omitted); *see Greene Cty. Sch. Dist. v. Circle Y Const., Inc.*, 291 Ga. 111, 112 (728 SE2d 184) (2012) ("The Court of Appeals review[s] de novo the trial court's ruling on the [defendant's] motion to dismiss, accepting as true all well-pled material allegations in the complaint and resolving any doubts in favor of

3

and Sawnee EMCs (collectively, the "distribution" or "retail" EMCs) are private, nonprofit electric cooperatives that are owned by the individuals, businesses, and other entities who purchase and receive electricity from them. Including the three EMCs that are named defendants in this case, there are 38 total distribution EMCs in Georgia, all of which are members of two larger electric cooperatives, Oglethorpe and GTC (collectively, the "wholesale EMCs"). All of the EMCs were formed under and are subject to the Georgia Electric Membership Corporation Act (the "EMC Act"), OCGA § 46-3-170 *et seq.*

Oglethorpe, one of the wholesale EMC defendants, was formed by and is owned by the 38 distribution EMCs. And since its formation, Oglethorpe has provided and sold power to those EMCs. In 1997, Oglethorpe created GTC as a separate wholesale EMC to operate its transmission unit, and to that end, GTC now

[the plaintiff]."). To that end, the facts set forth in this opinion are exclusively gleaned from the complaints filed in both cases, and for the purpose of resolving this appeal, we accept those alleged facts as true. But neither the trial court nor this Court is required to accept the "legal conclusions" asserted in any of the complaints and amended complaints. *See Trop, Inc. v. City of Brookhaven*, 296 Ga. 85, 87 (1) (764 SE2d 398) (2014) ("While a trial court is required to consider a non-moving party's factual allegations to be true, it is not required to accept the legal conclusions the non-party suggests that those facts dictate."); *NKN Enters., LLC v. Branch Banking & Trust Co.*, 335 Ga. App. 70, 72 (780 SE2d 777) (2015) ("[T]he trial court is not required to accept or adopt a party's legal conclusions, no matter how 'well-pled' the facts.").

4

constructs and maintains underground and above-ground power transmission lines, which transmit power to the retail EMCs' customers. But like Oglethorpe, GTC's members and owners are the 38 distribution EMCs, not any of the individual consumers. To summarize, individual consumers purchase electricity from and pay their power bills directly to the distribution EMC (of which they are members), and those EMCs purchase power wholesale from Oglethorpe and GTC.

Under the EMC Act, all electric cooperatives, including each of the named defendants in these consolidated cases, must operate on a nonprofit basis, which means that they must account for each member's patronage capital—*i.e.*, the member's pro rata share of the EMC's earnings in excess of its operating costs and expenses.[3] This means that when the wholesale EMCs generate extra profit above

---

[3] The Supreme Court of Georgia has described "[t]he typical cooperative system of allocating and remitting earnings to its members" as follows:

Statutes regulating the structure of cooperative associations and bylaws of such associations frequently provide for the retention by the association of all or a portion of the operating profit of the association to furnish capital for the association. In evidence of this, each member of the association is credited with his or her proportionate part of the profit on the books of the association, and is generally issued a certificate showing the credit.

their operating costs and expenses, they must annually allocate that patronage capital on their books on a pro rata basis to the accounts of their members, which are the 38 distribution EMCs. Similarly, the distribution EMCs must also allocate any patronage capital they accumulate on their books to the accounts of their members—*i.e.*, the individuals and businesses who purchase electricity from the distribution EMCs. Each EMC maintains an account on its books reflecting the cumulative amount of

> This plan is known as the revolving fund plan, or equity plan, and the credits are known as equity credits or patronage credits. These credits are in effect the capital of the cooperative, and raising capital in this way is the most equitable means by which a cooperative can acquire its capital from its patrons. The capital secured through such an equity plan is comparable to the earned surplus of a conventional business organization.

> Equity credits are not an indebtedness of a cooperative that is presently due and payable to the members, but represent an interest that will be paid to them at some unspecified later date, to be determined by the board of directors. The interest becomes vested only if the board of directors, following the bylaws, exercises its sound discretion in determining that such payments can be made without causing undue financial hardship to the association.

*Cason v. Cason*, 281 Ga. 296, 296 n.1 (637 SE2d 716) (2006) (punctuation omitted) (quoting 18 AmJur2d, Cooperative Associations § 20 (2006)).

6

patronage capital that has been allocated to each of its members over the years. And although members of the distribution EMCs no longer accrue patronage capital when they terminate service, the EMCs still maintain accounts on their books for their former members reflecting the amount of patronage capital allocated to them when they were members.

Until 1992, Oglethorpe refunded the patronage capital allocated to the distribution EMCs "on a 13 year revolving cycle." For example, if Oglethorpe still adhered to that practice, patronage capital that allocated to members of an EMC in 2001 would be refunded to those members 13 years later in 2014 and so on. Then, in 1993, however, Oglethorpe increased the length of this refund cycle from 13 years to 30 years. But just four years later, in 1997, Oglethorpe revoked its 30-year revolving cycle. And while it still must allocate patronage capital to its members' accounts, Oglethorpe has not *refunded* any patronage capital since that time. Moreover, although Oglethorpe refunded some patronage capital to the distribution EMCs prior to 1997, those EMCs never redistributed those refunds to their members. Also in 1997, Oglethorpe refunded $49,000,000 in patronage capital to the distribution EMCs to establish equity in and provide working capital to form GTC, but the members of the distribution EMCs did not receive any of that money.

7

Following Oglethorpe's 1997 distribution of patronage capital, it has continued to "accumulate tremendous amounts of capital credits," but it has not refunded those credits to the distribution EMCs. As of 2011, the former and current members of Walton EMC have allegedly been allocated (but not refunded) more than $46,000,000 in Oglethorpe patronage capital. And as of 2013, Jackson EMC's former and current members have allegedly been allocated (but not refunded) more than $78,000,000 in Oglethorpe patronage capital.[4] Although the plaintiffs who are former members of an EMC lack access to those EMCs' books,[5] they estimate that the amount of patronage capital owned by former and current members of the 38 distribution EMCs is nearly $2,000,000,000.

---

[4] Although the appellants, former and current members of *distribution* EMCs, assert that they have been allocated millions of dollars worth of "Oglethorpe capital credits," their complaints also allege (and it is undisputed) that they are not members of Oglethorpe and that Oglethorpe only allocates capital credits on its books to its *members*, the distribution EMCs. As a result, the plaintiffs appear to be referring to patronage capital that they believe *would* be allocated to them by their individual distribution EMCs only *if* Oglethorpe first refunded patronage capital to those EMCs.

[5] We note that under the EMC Act, a current member of an EMC has the right to inspect the books and records of that EMC, and if the EMC refuses to allow a member to do so, the member can then sue the EMC in superior court to enforce that right. *See infra* note 35; OCGA § 46-3-271 (b), (c). The Act does not, however, expressly grant that right to former members.

On March 13, 2014, Edgar "Ed" Walker, a former member of Walton EMC; Phillip Caltabiano, a former member of Cobb EMC; Grant Meade, a former member of Sawnee EMC; and Samer Khashan, a former member of Jackson EMC,[6] filed a class-action complaint against Oglethorpe, GTC, Walton EMC, Sawnee EMC, and Jackson EMC, primarily seeking payment of allocated, but not refunded, patronage capital. The lawsuit was brought on behalf of "[a]ll Georgia residents who are former members of the 38 retail distribution cooperatives comprising the membership of Oglethorpe . . . and [GTC] and who have unredeemed patronage[-]capital accounts on the books of any of those retail distribution cooperatives." Then, on July 28, 2014, the former-member plaintiffs filed their first-amended complaint, which appears to be a complete replacement of their initial complaint, rather than a supplement.

In the complaint, the former-member plaintiffs asserted the following claims against the wholesale and distribution EMCs: (1) declaratory, injunctive, and mandamus relief to remedy the EMCs' violation of OCGA § 46-3-340; (2) unjust

---

[6] For ease of reference, the plaintiff class consisting of former EMC members will be referred to throughout as "former-member plaintiffs" or "former-member appellants," and the plaintiff class consisting of current EMC members will be referred to as "current-member plaintiffs" or "current-member appellants." And when it is clear that a division of this opinion applies only to a particular plaintiff class, the class at issue will sometimes be referred to simply as "plaintiffs" or "appellants."

enrichment; (3) breach of fiduciary duty (only as to the distribution EMCs); (4) breach of contract; (5) conspiracy; (6) money had and received; (7) conversion; and (8) attorney fees. Approximately one year later, on July 9, 2015, the former-member plaintiffs supplemented the complaint to include a claim for abuse of discretion/breach of the duty of good faith.

Meanwhile, in a separate class action filed on August 21, 2014, Michael Shapiro, a current member of Walton EMC; and Bettye Black, a current member of Jackson EMC, sued Oglethorpe, GTC, Walton EMC, and Jackson EMC on behalf of "[c]urrent members of the 38 electric cooperatives that are members of Oglethorpe . . . and [GTC]," also seeking a refund of patronage capital. In their initial complaint, the current-member plaintiffs asserted claims for (1) unjust enrichment and constructive trust; (2) breach of fiduciary duty (against the Walton and Jackson EMCs only); and (3) breach of contract. Later, in the first and second amendments to their complaint, the current-member plaintiffs added claims for (4) abuse of discretion/breach of duty of good faith; (5) conversion as to Walton EMC and Jackson EMC; (6) conversion as to Oglethorpe and GTC; (7) conspiracy; and (8) money had and received.

In both class actions, the distribution EMCs and the wholesale EMCs filed separate motions to dismiss the complaints and amended complaints. Then, after responsive pleadings were filed, the trial court appointed Judge Stanley F. Birch, Jr., a retired federal judge from the Eleventh Circuit Court of Appeals, to serve as the special master and to issue a report and recommendation to the court in each case. In evaluating the motions to dismiss, Judge Birch reviewed extensive briefing, consisting of more than 250 pages and more than 300 citations of authority, after which he held a hearing on both cases that lasted more than nine hours.[7] Following the hearing, Judge Birch issued separate reports, recommending that the trial court grant the defendants' motions to dismiss in both cases. Subsequently, the current- and former-member plaintiffs filed motions for the trial court to reject the special master's reports and recommendations and allow their cases to proceed. But ultimately, the trial court denied those motions, adopted Judge Birch's report and recommendation, and dismissed the complaints in both cases. These appeals follow.

---

[7] As an aside, we note that Judge Birch's comprehensive and well-reasoned reports have greatly aided this Court in the resolution of this appeal.

At the outset, we reiterate that this Court conducts "a de novo review of a trial court's ruling on a motion to dismiss."[8] In doing so, our role is to determine whether "the allegations of the complaint, when construed in the light most favorable to the plaintiff, and with all doubts resolved in the plaintiff's favor, disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts."[9] Nevertheless, we need not adopt "a party's legal conclusions based on these facts."[10] With these guiding principles in mind, we turn now to the specific claims raised in these appeals.

*Case No. A17A0384*

1. The former-member appellants first argue that the special master (and therefore the trial court) applied the incorrect standard for reviewing motions to dismiss a complaint. We disagree.

---

[8] *Dove v. Ty Cobb Healthcare Sys., Inc.*, 316 Ga. App. 7, 9 (729 SE2d 58) (2012) (punctuation omitted); *accord Chandler v. Opensided MRI of Atlanta, LLC*, 299 Ga. App. 145, 145 (682 SE2d 165) (2009).

[9] *Dove*, 316 Ga. App. at 9 (punctuation omitted); *accord Chandler*, 299 Ga. App. at 145.

[10] *Dove*, 316 Ga. App. at 9 (punctuation omitted); *accord Trop, Inc.*, 296 Ga. at 87 (1); *Novare Grp., Inc. v. Sarif*, 290 Ga. 186, 191 (4) (718 SE2d 304) (2011).

12

The former-member appellants argue that the trial court erred in applying a "hybrid standard" drawn from both federal and state law that was "heavily influenced" by federal cases. They further contend that, although the court did not expressly adopt "the more restrictive federal standard" set forth in those cases, the standard it applied does not comport with Georgia law. Specifically, the former-member appellants appear to take issue with a portion of the special master's report that quotes a passage regarding standing from a dissent in a Supreme Court of Georgia opinion, *Charles H. Wesley Education Foundation, Inc. v. State Election Board*,[11] which cites two federal cases.[12] And the former-member appellants maintain that in applying this incorrect "hybrid" standard, the special master failed to accept their pleadings as true, construe them in a light most favorable to them, resolve all inferences in their favor, or otherwise give them the benefit of the doubt. But the special master's report (adopted by the trial court) expressly acknowledged that he was "required to take all the factual allegations in the complaint as true," and nothing in the report suggests that he rejected or disregarded any of the undisputed *factual* allegations set forth *supra*.

---

[11] 282 Ga. 707 (654 SE2d 127) (2007).

[12] *See id*. at 714 (1) n.7.

13

Moreover, the only examples that the former-member appellants identify as "facts" that the special master rejected are actually legal conclusions, which the trial court was not required to accept as true.[13] Specifically, the former-member appellants challenge the special master's construction of the phrase "cooperative non-profit basis" in the EMC Act, but the interpretation of a statute is a question of law for the court.[14] Further, the former-member appellants challenge the special master's conclusion that they failed to allege facts that would support claims for conspiracy and fraud. But determining whether the former-member appellants alleged sufficient facts to support a *legally* viable claim against the EMCs was precisely the question the trial court was required to resolve in ruling on the motions to dismiss.[15] And it bears repeating that in the absence of any specifically pleaded facts to support what amounts to a legal conclusion couched as fact, the trial court was not required to

---

[13] *See supra* note 10 & accompanying text.

[14] *See Jenkins v. State*, 284 Ga. 642, 645 (2) (670 SE2d 425) (2008) ("The interpretation of a statute is a question of law, which is reviewed de novo on appeal." (punctuation omitted)); *Montgomery Cty. v. Hamilton*, 337 Ga. App. 500, 503 (788 SE2d 89) (2016) (noting that the interpretation of a statute presents a question of law for the court).

[15] *See supra* notes 8-10 & accompanying text.

accept the conclusion as true.[16] In any event, regardless of the standard the trial court applied below, this Court reviews the trial court's decision on a motion to dismiss *de novo*, and in doing so, *we* have accepted as true all of the well-pleaded material allegations in the complaint.[17]

2. The former-member appellants next argue the trial court, by adopting the special master's report, erred in finding that they lacked standing to sue Oglethorpe, GTC, and any of the distribution EMCs of which they were never members. This claim is likewise without merit.

---

[16] *See Novare Grp., Inc.*, 290 Ga. at 191 (4) ("All well-pleaded facts are to be accepted as true. However, the trial court is not required to adopt a party's legal conclusions based on those facts."); *Ga. Farm Bureau Mut. Ins. Co. v. Croft*, 322 Ga. App. 816, 817 (746 SE2d 285) (2013) (holding that when considering whether to grant a motion to dismiss a complaint, "the trial court is not required to adopt a party's legal conclusions based on those facts" (punctuation omitted)).

[17] *See Greene Cty. Sch. Dist., Inc.*, 291 Ga. at 112 ("The Court of Appeals reviewed de novo the trial court's ruling on the [defendant's] motion to dismiss, accepting as true all well-pled material allegations in the complaint and resolving any doubts in favor of [the plaintiff]."); *Campbell v. Ailion*, 338 Ga. App. 382, 383 (790 SE2d 68) (2016) ("We review de novo a trial court's determination that a pleading fails to state a claim upon which relief can be granted, treating all material allegations set forth in the complaint as true, treating all denials set forth in the answer as false, and resolving any doubts in favor of the plaintiff.").

(a) *Breach of Contract and Related Tort Claims*

The general rule in Georgia is that "one not in privity of contract with another lacks standing to assert any claims arising from violations of the contract."[18] Moreover, OCGA § 51-1-11 (a) provides:

> No privity is necessary to support a tort action; *but*, if the tort results from the *violation of a duty which is itself the consequence of a contract*, the right of action is confined to the parties and those in privity to that contract, except in cases where the party would have a right of action for the injury done independently of the contract.[19]

---

[18] *Dominic v. Eurocar Classics*, 310 Ga. App. 825, 828 (1) (714 SE2d 388) (2011); *see* OCGA § 9-2-20 (a) ("As a general rule, an action on a contract, whether the contract is expressed, implied, by parol, under seal, or of record, shall be brought in the name of the party in whom the legal interest in the contract is vested, and against the party who made it in person or by agent.").

[19] Emphasis supplied. *See Wansor v. George Hantscho Co.*, 243 Ga. 91, 91-92 (252 SE2d 623) (1979) (quoting the principle of law set forth in OCGA § 51-1-11 (a)); *Ellis v. Rich's, Inc.*, 233 Ga. 573, 577 (212 SE2d 373) (1975) (same); *Jai Ganesh Lodging, Inc. v. David M. Smith, Inc.*, 328 Ga. App. 713, 719 (3) (a) (760 SE2d 718) (2014) ("While privity of contract is generally not necessary to support an action in tort, if the tort results from the violation of a duty which is itself the consequence of a contract, the right of action is confined to the parties and those in privity to that contract, except in cases where the party would have a right of action for the injury done independently of the contract." (punctuation omitted)); *Dominic*, 310 Ga. App. at 830 (2) ("[W]here privity of contract between the parties does not exist, to constitute a tort, the duty must arise independent of the contract." (punctuation omitted)).

In this case, the former-member appellants' contract and related tort claims, albeit stated in different terms, all essentially sought to establish and enforce a duty under each of the EMCs' bylaws to refund patronage capital to their members, either at the time when a member terminates his or her membership or after some "reasonable," but unspecified, length of time.[20] Nevertheless, the former-member appellants have not alleged that the EMCs have a duty to refund patronage capital independent of the contract itself.[21] Thus, they lack standing as to their tort claims as

[20] The former-member appellants summarily assert—without any further elaboration and citing only a statute providing that deprivation of property is a tort—that because their claims for unjust enrichment and money had and received are equitable in nature and because a conversion claim does not require a contractual relationship, they have standing to bring those claims even though they have no contractual relationship with the wholesale EMCs. To the extent that these appellants have not abandoned that argument on appeal, their conversion claim is time-barred for the reasons discussed in Division 3 *infra*, and they have failed to state a claim for unjust enrichment or money had and received for the reasons given in Division 5 (b) *infra. See Kramer v. Yokely*, 291 Ga. App. 375, 383 (3) (662 SE2d 208) (2008) (noting that mere conclusory statements are not the kind of meaningful argument required by Court of Appeals Rule 25 (a) (3)); *All Fleet Refinishing, Inc. v. W. Ga. Nat'l Bank*, 280 Ga. App. 676, 682-83 (6) (634 SE2d 802) (2006) (deeming a claim of error abandoned when there was no "meaningful argument" in the appellant's brief).

[21] We note that the former-member appellants alleged that, other than the duty imposed by their bylaws, the EMCs also have a statutory duty to refund patronage capital prior to dissolution, but as explained more fully below, the statute at issue does not impose such a duty or provide them with a private right of action to enforce its provisions.

17

well as their contract-based claims absent a showing that they are in privity of contract with the particular EMC at issue.[22]

In the case *sub judice*, the only potential contracts that were identified by the former-member appellants as having been breached are each EMC's bylaws. But they acknowledged that each EMC's bylaws "constitute a contract between the cooperative *and its members*"[23] and that the distribution EMCs are the *sole* members of Oglethorpe and GTC. Moreover, the complaint is devoid of any allegations that the former-member appellants have ever contracted with any EMC other than the particular distribution EMC of which they are former members. Thus, the trial court correctly found that, due to a lack of privity, each individual plaintiff in the former-member class lacks standing to bring any contract or any tort claim arising from a

---

[22] *See* OCGA § 51-1-11 (a); *Dominic*, 310 Ga. App. at 830 (2) (holding, *inter alia*, that a plaintiff lacked standing to sue to enforce a contractual duty when he was not a party to the relevant contract and he did not identify a legal duty owed by the defendant independent of the contract)); *J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 284 Ga. App. 552, 555 (a) (644 SE2d 440) (2007) ("Where privity of contract between the parties does not exist, to constitute a tort the duty must arise *independent of the contract*." (punctuation omitted) (emphasis supplied)).

[23] Emphasis supplied.

breach of that contract against Oglethorpe, GTC, and any of the 38 distribution EMCs of which he or she has never been a member.[24]

Lastly, we note that because all of the former-member appellants—as well as any other former member of a *distribution* EMC the appellants purport to represent—lack standing to sue Oglethorpe and GTC for breach of contract or for any tort claim based on a violation of their bylaws, DeKalb County is no longer a proper venue to bring such claims against any of the remaining EMC defendants. Indeed, the former-member appellants' complaint asserted that venue in DeKalb County is proper as to Oglethorpe and GTC because they maintain their principal places of business and their registered agents in that county.[25] And they alleged that venue is proper as to the remaining defendants (*i.e.*, Jackson, Walton, and Sawnee EMCs) solely because

---

[24] *See supra* notes 18, 19, and 22 & accompanying text.

[25] *See* OCGA § 14-2-510 (providing that venue against a corporation is proper, *inter alia*, "in the county of this state where the corporation maintains its registered office; or if the corporation fails to maintain a registered office, it shall be deemed to reside in the county where its last named registered office or principal office . . . ."); *Hallmark Props., Inc. v. Slater*, 229 Ga. 432, 433 (1) (192 SE2d 157) (1972) (noting that, for determining proper venue, a corporation is "deemed to reside in the county where it maintains its registered office" or where it "maintains its principal office"); *Gault v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 208 Ga. App. 134, 135 (430 SE2d 63) (1993) (holding that, as to one corporation, venue was proper in Fulton County because it had a registered agent for service there).

they are joint obligors and tortfeasors with Oglethorpe and GTC.[26] But in order to maintain a suit against a nonresident, it is essential that a cause of action be alleged and proven against the resident defendant."[27] Thus, because the former-member appellants lack standing to sue the two resident defendants (*i.e.*, Oglethorpe and GTC), venue is no longer proper as to the remaining nonresident defendants (*i.e.*, the distribution EMCs).[28]

---

[26] *See* Ga. Const. Art. VI, Sec. II, Par. IV ("Suits against joint obligors, joint tort-feasors, joint promisors, copartners, or joint trespassers residing in different counties may be tried in either county."); *see also Re/Max 100 of Sandy Springs, Inc. v. Tri-Cont'l Leasing Corp.*, 177 Ga. App. 111, 111 (1) (338 SE2d 542) (1985) ("Our Constitution provides that joint obligors may be sued in any county where one resides.").

[27] *Chitty v. Jones*, 210 Ga. 439, 439 (1) (80 SE2d 694) (1954); *see Colony Bank Worth v. Caterpillar Fin. Servs. Corp.*, 281 Ga. App. 397, 398 (636 SE2d 119) (2006) ("[T]he trial court loses venue as to the nonresident defendant if no judgment is taken against the resident defendant, whether the resident is found not liable or dismissed with prejudice." (punctuation omitted)); *Robinson v. Star Gas of Hawkinsville, Inc.*, 243 Ga. App. 112, 113 (533 SE2d 97) (2000) (same).

[28] We acknowledge that, when venue is determined to be improper, the appropriate response is to transfer the case to a proper venue. *See Ga. Dep't of Human Servs. v. Dougherty Cty.*, 330 Ga. App. 581, 583 (2) (768 SE2d 771) (2015) ("When it is determined that venue is improper, the appropriate response to a motion to dismiss is to transfer the case to the proper venue."). But as explained more fully herein, the trial court was authorized to dismiss the former-member appellants' complaint as to the distribution EMCs for reasons other than an independent of lack of venue.

(b) *Violation of the EMC Act*

In addition to the contract and related tort claims, the former-member plaintiffs alleged that all of the EMCs violated a requirement in OCGA § 46-3-340 that they periodically refund patronage capital prior to dissolution. But the trial court concluded that OCGA § 46-3-340 does not provide a right of action for the former-member appellants to enforce its provisions, and they do not challenge that determination on appeal. Indeed, although Count 1 of their complaint specifically requested relief for a violation of OCGA § 46-3-340 and the former-member appellants devote a significant portion of their opening brief to discussing the history, "purpose," and alleged requirements of the EMC Act, they nevertheless maintain that they "do not need a private right of action" under OCGA § 46-3-340 to bring their claims.[29] Thus, the former-member appellants have abandoned any claim that they have a private right of action under OCGA § 46-3-340 to compel any of the EMC

---

[29] The former-member appellants contend in their opening brief that they do not need a private right of action to enforce OCGA § 46-3-340 because "[t]he duties imposed by the Act are binding on [the EMCs] and thus can be enforced through an action for tort or breach of contract." But this argument is based on the assumptions that these appellants have standing to sue the EMCs of which they were never members for breach of contract and related torts and that their complaint was sufficient to state such claims. They are mistaken. Both of these assumptions are baseless for the reasons outlined in Divisions 2 (a), 2 (c)-(f) and 5 of this opinion.

defendants to refund patronage capital at any particular time or on any specific schedule.[30] Moreover, as explained in Division 4 *infra*, OCGA § 46-3-340 does not require that the EMCs do so.

Furthermore, because the EMC Act and its alleged requirements are discussed at such length in the former-member appellants' brief, it is worth noting that the trial court did not err in finding that there is no private right of action to enforce the provisions of OCGA § 46-3-340. It is well settled in Georgia that "violating statutes and regulations does not automatically give rise to a civil cause of action by an individual claiming to have been injured from a violation thereof."[31] Instead, the statutory text must "expressly provide a private cause of action."[32] And even when the

---

[30] *See Murphy v. Freeman*, 337 Ga. App. 221, 223-24 (1) (787 SE2d 755) (2016) ("Any enumeration of error which is not supported in the brief by citation of authority or argument may be deemed abandoned." (punctuation omitted)); *EZ Green Assocs., LLC v. Georgia-Pacific Corp.*, 331 Ga. App. 183, 190 (3) (770 SE2d 273) (2015) (declining to address a claim when the appellant did not develop a cogent argument or cite to any authority support it); Court of Appeals Rule 25 (c) (2).

[31] *Best Jewelry Mfg. Co. v. Reed Elsevier Inc.*, 334 Ga. App. 826, 833 (1) (b) (780 SE2d 689) (2015) (punctuation omitted); *accord Forsh v. Williams*, 321 Ga. App. 556, 561 (2) (740 SE2d 297) (2013); *Govea v. City of Norcross*, 271 Ga. App. 36, 41 (1) (608 SE2d 677) (2004).

[32] *Best Jewelry Mfg. Co.*, 334 Ga. App. at 833 (1) (b) (punctuation omitted); *accord State Farm Mut. Auto. Ins. Co. v. Hernandez Auto Painting & Body Works, Inc.*, 312 Ga. App. 756, 761 (2) (719 SE2d 597) (2011).

22

private right of action is alleged to be *implied* by the statute, "the indication that the legislature meant to impose a civil . . . penalty must be *found in the provisions of the statute at issue*, not extrapolated from the public policy the statute generally appears to advance."[33] Suffice it to say, in the absence of such textual support, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."[34] In the instant case, the appellants have not identified (or even argued that there is) any textual basis in OCGA § 46-3-340 suggesting that they have a private right of action to enforce its provisions. Indeed, the text of OCGA § 46-3-340, in its entirety, is set forth below in Division 4 *infra* and is devoid of any language indicating there is a private right of action to enforce its terms. Thus, even if that statute imposed the duties on EMCs that the former-member appellants allege, they lack standing to sue the EMCs for breaching those duties.[35]

---

[33] *Anthony v. Am. Gen. Fin. Servs., Inc.*, 287 Ga. 448, 455 (2) (a) (697 SE2d 166) (2010) (punctuation omitted); *accord Somerville v. White*, 337 Ga. App. 414, 416 (1) (787 SE2d 350) (2016).

[34] *Somerville*, 337 Ga. App. at 416-17 (1); *accord Alexander v. Sandoval*, 532 U.S. 275, 286-87 (II) (121 SCt 1511, 149 LE2d 517) (2001).

[35] We note that, unlike OCGA § 46-3-340, another section of the EMC Act (OCGA § 46-3-271) expressly provides for a private right of action to enforce its

Nevertheless, the former-member appellants argue that they have standing to enforce a "breach of statutory duty" under OCGA § 51-1-6, which provides that "[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." But as explained by our Supreme Court, the alleged duty "cannot rest solely upon OCGA § 51-1-6 because this statute sets forth merely general principles of tort law."[36] Indeed, by its express terms, tort liability under OCGA § 51-1-6 mandates that "the alleged tortfeasors have breached a legal duty to

---

requirement that an EMC allow its members to inspect its books and records. *See* OCGA § 46-3-271 (c) (providing that if an EMC refuses to permit inspection of its books and records authorized in subsection (b) of that statute, the member demanding inspection may apply to the superior court for relief). Thus, we must presume that if the General Assembly also wished to allow EMC members to sue an EMC to seek relief for a violation of OCGA § 46-3-340, "it would have expressly authorized them to do so." *Kemp v. Kemp*, 337 Ga. App. 627, 636 (788 SE2d 517) (2016).

[36] *Wells Fargo Bank, N.A. v. Jenkins*, 293 Ga. 162, 164 (744 SE2d 686) (2013); *accord Branch Banking & Trust Co. v. Morrisroe*, 323 Ga. App. 248, 249 (746 SE2d 859) (2013); *see Gobran Auto Sales, Inc. v. Bell*, 335 Ga. App. 873, 877 (2) (783 SE2d 389) (2016) (explaining that OCGA § 51-1-6 "do[es] not create causes of action, but simply set[s] forth general principles of tort law, authorizing the recovery of damages for the breach of a legal duty otherwise arising, though not expressly stated, under a statute or common law").

perform a beneficial act or to refrain from doing an injurious act."[37] Thus, the legal

duty necessary to support the former-member appellants' claims "must be found in

another legislative enactment,"[38] which they assert is OCGA § 46-3-340. But for the

reasons set forth in Division 4 *infra*, OCGA § 46-3-340 does not impose the legal

duties on EMCs that the former-member appellants allege that it does, and they

cannot rely on OCGA § 51-1-6 to create them.[39]

(c) *Conspiracy*

The former-member appellants further argue they have standing to sue all of

the EMCs, including Oglethorpe and GTC, because the EMCs "acted in concert and

as part of a conspiracy reflected in, among other things, their joint decisions,

---

[37] *Jenkins*, 293 Ga. at 164.

[38] *Id*. at 164; *see Pulte Home Corp. v. Simerly*, 322 Ga. App. 699, 705 (746 SE2d 173) (2013) ("OCGA § 51-1-6 does not create a legal duty but defines a tort and authorizes damages when a legal duty is breached." (punctuation omitted)).

[39] *See Daimler Chrysler Motors Co., LLC v. Clemente*, 294 Ga. App. 38, 48 (2) (a) (668 SE2d 737) (2008) (holding that a plaintiff, who purchased a car from the defendant automobile franchiser, could not maintain an action under OCGA § 51-1-6 for a violation of the Franchise Practices Act because that Act does not impose a legal duty upon automobile franchisers toward consumers); *Project Control Servs., Inc. v. Reynolds*, 247 Ga. App. 889, 893 (3) (545 SE2d 593) (2001) (affirming the trial court's dismissal of a claim under OCGA § 51-1-6, in which they sought relief for a violation of the Georgia Public Accountancy Act, because the defendants did not owe the plaintiff a legal duty).

25

interlocking boards, integrated business structure, and common economic interest."

And they are correct that "[a]fter [a] conspiracy is formed, members of the conspiracy are jointly and severally liable for acts of co-conspirators done in furtherance of the conspiracy."[40] But as we have explained,

> [a] conspiracy is a combination of two or more persons to accomplish an *unlawful* end or to accomplish a lawful end by *unlawful* means[,] [and] [t]o recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort."[41]

---

[40] *McIntee v. Deramus*, 313 Ga. App. 653, 656 (722 SE2d 377) (2012); *accord Tyler v. Thompson*, 308 Ga. App. 221, 225 (707 SE2d 137) (2011); *see Nottingham v. Wrigley*, 221 Ga. 386, 388 (144 SE2d 749) (1965) ("[A]s to the consequences of a conspiracy, the rule is well established that the act of one is the act of all. Conspirators are jointly and severally liable for all the acts of each, done in pursuance of the conspiracy." (punctuation omitted)).

[41] *Hartsock v. Rich's Emps. Credit Union*, 279 Ga. App. 724, 725-26 (2) (632 SE2d 476) (2006) (punctuation omitted); *accord Cook v. Robinson*, 216 Ga. 328, 328 (1) (116 SE2d 742) (1960).

Indeed, absent the underlying tort, "there can be no liability for civil conspiracy."[42]

Here, although the former-member appellants asserted a conspiracy claim in their complaint, they do not challenge the trial court's dismissal of that claim on appeal. Thus, they have abandoned any argument that their complaint was sufficient to state a claim for conspiracy to commit any particular unlawful act.[43] But regardless, the former-member appellants cannot rely on a conspiracy theory as a basis to sue all of the EMC defendants as joint tortfeasors because, for reasons set forth more fully in Division 5 *infra*, they have failed to state a claim as to any underlying tort or unlawful act, which is required to impose liability for civil conspiracy.[44]

---

[42] *Hartsock*, 279 Ga. App. at 726 (2) (punctuation omitted); *see U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 264 Ga. 295, 297 (1) (443 SE2d 833) (1994) ("Accurately speaking, there is no such thing as a civil action for conspiracy. There is an action for damages caused by acts pursuant to a formed conspiracy, but none for the conspiracy alone." (punctuation omitted)).

[43] *See Hutchinson v. Whaley*, 333 Ga. App. 773, 776-77 (2) (777 SE2d 251) (2015) (deeming assertions made in the appellant's brief abandoned when they were not separately enumerated as errors and they were unsupported by any cogent legal argument or citation to authority); *Smyrna Dev. Co. v. Whitener Ltd. P'ship*, 280 Ga. App. 788, 790 (1) (635 SE2d 173) (2006) (holding that an appellant waived and abandoned any argument challenging the trial court's grant of summary judgment against it because the appellant did not enumerate it as an enumeration of error in its brief).

[44] *See supra* notes 41-42 & accompanying text; *Cook*, 216 Ga. at 329 (1) (explaining that when "the act of conspiring is itself legal, the means or method of its

(d) *Juridical-Link Doctrine*

The former-member appellants next argue that, regardless of whether they have directly interacted with all of the defendant EMCs, they can sue those EMCs under the "juridical[-]link doctrine" because they are linked through contracts or other independent relationships. In *Moore v. Comfed Savings Bank*,[45] the Eleventh Circuit Court of Appeals acknowledged that this doctrine had been applied in a few other cases at the district-court level to provide standing to plaintiffs in class actions.[46] But the *Moore* Court further explained that, while all of those trial-court cases supported the plaintiffs' view that

> in the event there is a juridical link, it is appropriate to join as a defendant a party with whom the named class representative did not have a direct contact, each of them presents a situation in which there was either a contractual obligation among all defendants or a state or local statute requiring common action by the defendants.[47]

---

accomplishment must be illegal" to establish civil liability for conspiracy).

[45] 908 F2d 834 (11th Cir. 1990).

[46] *See id.* at 838 (IV) (A).

[47] *Id.*

And here, the former-member appellants have not identified any specific contract under which *all* of the EMC defendants share the same contractual obligation or any statute requiring a *common* action by all of the wholesale and retail EMCs.[48] Regardless, the appellants concede that no Georgia court has ever adopted the juridical-link doctrine, and even in *Moore*, the Eleventh Circuit merely discussed the doctrine in dictum and chose not to apply it.[49] We likewise decline to apply it now in this case.

(e) *Agency*

The former-member appellants further assert that, notwithstanding the fact they are not parties to any contracts between the wholesale EMCs and their members, they have standing to sue the wholesale EMCs for a breach of their bylaws because the distribution EMCs, which are parties to those bylaws, are their agents. But to prove actual agency, the purported principal must have "assumed the right to control the

---

[48] To the extent that the EMC Act requires the "common action" of EMCs to operate on a nonprofit basis, the Act does not require EMCs to perform the particular action that the former-member appellants allege it does for the reasons given in Division 4 *infra*.

[49] *See Moore*, 908 F2d at 838-39 (IV) (A) (discussing the juridical-link doctrine, but ultimately holding that joinder of the defendants was permitted by Federal Rule of Civil Procedure 20).

method, manner, and time of the purported agent's work, as distinguished from the right merely to require certain definite results in conformity to the contract."[50] And here, the appellants have not identified any factual allegations in their complaint indicating that they have assumed control over the method, manner, or timing of any distribution EMC's operations. Indeed, while the former-member appellants reference their claim that EMCs are "wholly or substantially controlled by their consumers," the only *factual allegation* in the complaint to support this assertion is that *current* members of an EMC have the right to vote annually to elect the EMC's board of directors, which presumably handles the EMC's day-to-day operations. The complaint does not allege that the individual members of a distribution EMC have any actual control over the daily operations of the EMC from which they purchase electricity for their residence or business. And the right to elect board members does not amount to the members personally assuming day-to-day control over the operations of any particular EMC.[51] In fact, the former-member appellants' primary concern in this case

---

[50] *Satisfaction & Serv. Hous., Inc. v. SouthTrust Bank, Inc.*, 283 Ga. App. 711, 713 (642 SE2d 364) (2007) (punctuation omitted); *accord Kids R Kids Int'l, Inc. v. Cope*, 330 Ga. App. 891, 892-93 (1) (769 SE2d 616) (2015); *Summit Auto. Grp., LLC v. Clark*, 298 Ga. App. 875, 883 (4) (681 SE2d 681) (2009).

[51] *See Clark*, 298 Ga. App. at 883 (4) (holding that, as a matter of law, no agency relationship existed between a franchisor and a franchisee when the franchisor

is their lack of control over the EMCs' decisions regarding if and when to retire patronage capital. Thus, even accepting all of the factual allegations in the complaint as true, the former-member appellants did not allege sufficient facts to establish an agency relationship between themselves and any of the distribution EMCs.[52]

(f) *Third-Party Beneficiaries*

Finally, the former-member appellants argue they have standing to sue Oglethorpe and GTC because they are third-party beneficiaries of those EMCs' bylaws. Although the appellants are indeed correct that a third-party beneficiary does not need to be specifically named in the contract, "the contracting parties' intention to benefit the third party must be shown *on the face* of the contract."[53] Moreover, the

---

did not retain "day-to-day supervisory control of the franchisee's business operations"); *Clemente*, 294 Ga. App. at 45 (1) (a) (holding that the plaintiff failed to show that an agency relationship existed when there was no evidence that the alleged principal "controlled the time, manner, and method of [the alleged agent's] daily operations"); *Wells v. Vi-Mac, Inc.*, 226 Ga. App. 261, 261-62 (1) (486 SE2d 400) (1997) (holding that a gas station owner and operator was not an agent of his gas supplier because, although the supplier "could require [the owner] to sell only [certain] products and comply with [certain] standards for cleanliness and appearance, [it] could not otherwise control [the owner's] hours or manner of operation").

[52] *See supra* notes 50-51 & accompanying text.

[53] *Donnalley v. Sterling*, 274 Ga. App. 683, 685 (1) (618 SE2d 639) (2005) (punctuation omitted) (emphasis supplied); *accord CDP Event Servs., Inc. v. Atcheson*, 289 Ga. App. 183, 184 (1) (656 SE2d 537) (2008); *see Backus v. Chilivis*,

31

mere fact that a third party would benefit from the performance of an agreement is

insufficient to establish standing.[54] And while the appellants contend that the intent

of the parties to a contract to benefit a third party is "typically" a fact question,[55] they

have not identified any specific provision or language *on the face of* Oglethorpe or

GTC's bylaws that would support a jury finding that these wholesale EMCs intended

236 Ga. 500, 502 (II) (224 SE2d 370) (1976) ("In order for a third party to have standing to enforce a contract[,] . . . it must clearly appear from the contract that it was intended for his benefit.").

[54] *Donnalley*, 274 Ga. App. at 685; *accord Kaesemeyer v. Angiogenix, Inc.*, 278 Ga. App. 434, 437 (1) (629 SE2d 22) (2006); *see Backus*, 236 Ga. at 502 (II) (noting that "[t]he mere fact that [a third party] would benefit from performance of the agreement is not alone sufficient" to make him a third-party beneficiary of the agreement).

[55] The sole case that the former-member appellants rely on for the proposition that the intent of the parties to a contract to benefit a third party is typically a fact question makes no such broad-sweeping pronouncement. Instead, in that case, this Court acknowledged that "a third party is entitled to recover from an accountant, despite the absence of privity, where the third party is in a limited class of persons known to be *relying upon representations of accountants*." *Travelers Indem. Co. v. A. M. Pullen & Co.*, 161 Ga. App. 784, 786 (2) (289 SE2d 792) (1982) (emphasis supplied). And under the circumstances of that particular case, this Court was "confronted with a question of fact as to what intent, if any, may be found within [an] agreement between [an] accounting firm and the principal concerning the principal's surety" as to whether the surety was an intended beneficiary of the financial information provided. *Id.* 797-98 (8). Nevertheless, as we have just explained, the intent of contracting parties to benefit a third party must be found *on the face* of the contract itself, and "[c]ontractual interpretation is generally a matter of law to be decided by the court[.]" *Knott v. Knott,* 277 Ga. 380, 381 (2) (589 SE2d 99) (2003).

for their bylaws to benefit the former, or even current, members of the distribution EMCs.[56] Thus, the appellants cannot establish standing to sue the wholesale EMCs on this basis.[57]

3. The former-member appellants further contend the trial court erred in finding that their claims were barred by the applicable statutes of limitation. Again, we disagree.

Even if the former-member appellants had standing to sue the individual distribution EMC of which they *were* previously members, the trial court correctly found that their claims are time-barred. In Georgia, "[t]he true test to determine when

[56] As explained in note 94 *infra*, the bylaws of each of the defendant EMCs were properly considered by the trial court because they were attached and incorporated into the defendants' pleadings.

[57] The former-member appellants summarily contend that, despite their lack of privity to the bylaws of the wholesale and retail EMCs of which they were never members, they have standing because the EMCs assigned their interest in those bylaws to the appellants and because the appellants are the "real part[ies] in interest." But the appellants acknowledge that they never obtained a ruling on these arguments in the trial court, and under such circumstances, this Court will not consider them. *See CDP Event Servs.*, 289 Ga. App. at 187 (2) ("This court is for the correction of errors [of law], and where the trial court has not ruled on an issue, we will not address it." (punctuation omitted)). Furthermore, the appellants have also abandoned these claims by failing to develop any cogent argument or cite to relevant legal authority to support them. *See Ware v. Multibank 2009-1 RES-ADC Venture, LLC*, 327 Ga. App. 245, 251 (3) (758 SE2d 145) (2014) (declining to address a claim of error when appellant failed "to provide any cogent argument or citation of authority").

33

a cause of action accrues is to ascertain the time when the plaintiff could first have maintained his or her action to a successful result."[58] And on a contract claim, "the statute of limitations begins to run at the time of its alleged breach."[59]

Here, the former-member appellants' complaint alleged that "[r]epayment of former members' patronage capital is an obligation of each [d]efendant [that] *must be done on at least an annual basis*."[60] The appellants also claimed that the "[c]orrect application of cooperative principles and state and federal tax law should result in the *immediate refund* of patronage capital *when service terminated*[.]"[61] As a result, they could have maintained an action seeking such a refund either immediately after they terminated their accounts or when they did not begin receiving annual refunds after termination. And because 2005 is the most recent year that any named plaintiff

---

[58] *Scully v. First Magnolia Homes*, 279 Ga. 336, 337 (1) (614 SE2d 43) (2005) (punctuation omitted); *accord Wallace v. Bock*, 279 Ga. 744, 747 (2) (620 SE2d 820) (2005).

[59] *Wallace*, 279 Ga. at 747 (2); *see Hamburger v. PFM Capital Mgmt., Inc.*, 286 Ga. App. 382, 385 (1) (649 SE2d 779) (2007) ("[W]ith respect to a breach of contract claim, the statute of limitation runs from the time the contract is broken rather than from the time the actual damage results or is ascertained." (punctuation omitted)).

[60] Emphasis supplied.

[61] Emphasis supplied.

terminated his account without receiving a refund of patronage capital, the substantive claims brought in the appellants' original complaint, which was filed in 2014, are all barred by a four- or six-year statute of limitations.[62]

With respect to their conversion claim, the former-member appellants alleged that, in 1997, Oglethorpe made a patronage capital refund of $49,000,000 to the distribution EMCs, and in 1990 through 1992, Oglethorpe refunded other unknown amounts of patronage capital to the distribution EMCs. And they further alleged that the distribution EMCs wrongfully withheld these funds, in which the appellants "had an immediate possessory interest." But regardless of whether they adequately stated a conversion claim, such claims are subject to a four-year statute of limitations[,][63] and the "statute of limitation [for conversion] begins to run when the damage from

---

[62] *See Newell Recycling of Atlanta, Inc. v. Jordan Jones & Goulding, Inc.*, 288 Ga. 236, 237 (703 SE2d 323) (2010) ("The statute of limitations on all simple contracts in writing is six years . . . ." (punctuation omitted)); *Evans v. Evans*, 237 Ga. 549, 553 (228 SE2d 857) (1976) (noting that an unjust-enrichment claim is subject to a four-year statute of limitation); *Macomber v. First Union Nat'l Bank of Ga.*, 212 Ga. App. 57, 58 (1) (441 SE2d 276) (1994) ("The statute of limitation in an action for money had and received is four years.").

[63] *See* OCGA § 9-3-32 ("Actions for the recovery of personal property, or for damages for the conversion or destruction of the same, shall be brought within four years after the right of action accrues . . . .").

35

the tortious act is actually sustained by plaintiffs,"[64] which in this case would be the dates of the alleged conversions between 1990 and 1997.[65] Because the instant action was not initiated until 2014, well over four years after any of the alleged conversions, the appellants' conversion claim is statutorily time-barred.

Nevertheless, the former-member appellants argue the statute of limitations did not begin to run until the EMCs breached their duty to refund patronage capital "within a reasonable time" after they terminated their accounts. They further claim that the trial court ignored their alternative request for relief that the EMCs establish "an ongoing schedule to retire patronage capital over time." But in addition to their allegations that they were entitled to a refund of patronage capital upon terminating their accounts or annually thereafter, the appellants also defined a "reasonable" rotating schedule for refunding patronage capital to be *no longer than 13 years.* And according to their complaint, the distribution EMCs (of which the appellants were former members) "have *never* refunded patronage capital originally allocated to them

_____

[64] *Stewart v. Warner*, 257 Ga. App. 322, 323 (571 SE2d 189) (2002).

[65] *See id.* at 322-23 (holding that the four-year statute of limitation for a conversion claim began to run on the date of the alleged conversion); *Logan v. Tucker*, 224 Ga. App. 404, 406 (2) (480 SE2d 860) (1997) ("As a general rule, a right of action for wrongful conversion accrues on the date of the conversion.").

by Oglethorpe and [GTC] . . . ."[66] Thus, the appellants should have had sufficient knowledge to file a complaint challenging the EMCs' failure to periodically refund patronage capital at least as early as 13 years after patronage capital was first allocated to them, and they did not receive a refund of same. Because the appellants alleged that they first became members of distribution EMCs at times ranging from 1976 to 1993, we reject their apparent argument that the statute of limitations did not begin to run until some unspecified time after March 13, 2008 (*i.e.*, six years before they filed their March 13, 2014 complaint).

Next, the former-member appellants argue that the trial court erred in rejecting their claim that the statute of limitations was tolled due to fraudulent concealment. In Georgia, if a defendant is "guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud."[67] But where the gravamen of the underlying action is *not a claim of fraud*, "the statute of limitations is tolled only

---

[66] Emphasis supplied.

[67] *Hamburger*, 286 Ga. App. at 388 (4) (punctuation omitted); *accord Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 846 (1) (507 SE2d 411) (1998).

37

upon a showing of a separate independent actual fraud involving moral turpitude which deters a plaintiff from filing suit."[68] Under such circumstances,

> before the running of the limitation period will toll, it must be shown that the defendant concealed information by an intentional act—something more than a mere failure, with fraudulent intent, to disclose such conduct, unless there is on the party committing such wrong a duty to make a disclosure thereof by reason of facts and circumstances, or the existence between the parties of a confidential relationship.[69]

Here, the former-member appellants' complaint alleged, generally, that the EMCs both concealed and breached their obligation to periodically refund patronage capital. But they also alleged that this obligation arises from the EMC Act, a statute available to the public, and the bylaws of each EMC, which the appellants have never alleged were concealed from them. And in fact, the EMC Act authorizes members of an EMC to sue an EMC in superior court to enforce their statutory right to inspect an EMC's books and records.[70] And even if they no longer have that right as former

---

[68] *Hamburger*, 286 Ga. App. at 388 (4) (punctuation omitted) (emphasis supplied); *accord Frame*, 269 Ga. at 847 (1).

[69] *Hamburger*, 286 Ga. App. at 388 (4) (punctuation omitted); *accord Frame*, 269 Ga. at 847 (1).

[70] *See* OCGA § 46-3-271 (b), (c); *supra* note 35.

EMC members, this information was at least available to them prior to when they terminated their accounts. Significantly, to the extent the appellants needed additional information that was not available in the EMCs' bylaws and the EMC Act to bring this lawsuit, they have not identified, either in their complaint or on appeal, what that information was or any particular time when they discovered the alleged fraudulent concealment such that they had sufficient information to initiate this lawsuit.[71] In any event, even if the issue of when each of their claims accrued is, as they contend, a question of fact for the jury, their complaint was also properly dismissed for lack of standing and failure to state a claim for the reasons given in Divisions 2 and 5 herein.

4. The former-member appellants argue the trial court erred in finding that the wholesale and distribution EMCs have no obligation under any circumstances to refund patronage capital except upon dissolution. This claim is likewise without merit.

---

[71]*See Goldston v. Bank of Am. Corp*., 259 Ga. App. 690, 696-97 (577 SE2d 864) (2003) ("Where the fraudulent concealment is in breach of a confidential relation involving a duty to make full disclosure, the statute of limitation does not begin to run *until the discovery of the fraud*." (punctuation omitted) (emphasis supplied)); *Green v. White*, 229 Ga. App. 776, 779 (1) (b) (494 SE2d 681) (1997) (same).

The former-member appellants argue that the EMC Act requires EMCs to refund patronage capital before dissolution at "reasonable times,"[72] and they cite to several sections of the Act in their appellate brief that they allege support this claim.[73] But as previously explained, they have no private right of action to sue an EMC under the EMC Act to recover patronage capital. Nevertheless, because the statutory requirements of the EMC Act appear to be the primary basis underlying all of the appellants' numerous claims (in both cases), it is worth noting that, even if the appellants had a statutory right to sue to enforce the provisions of the EMC Act, their complaint did not identify any action or inaction by the EMCs that violated the Act. Specifically, although their appellate briefs cite several provisions of the Act and discuss its provisions at length, Count 1 of the complaint only identified OCGA § 46-3-340 as the provision requiring an EMC to refund patronage capital prior to

[72] As previously mentioned, the former-member appellants alleged that, at a minimum, 13 years is a reasonable cycle for refunding patronage capital, noting that Oglethorpe refunded patronage capital on a 13-year cycle prior to 1994, when Oglethorpe's board lengthened the cycle to 30 years before revoking the use of a fixed cycle altogether.

[73] To support this enumeration of error, the former-member appellants also argue that EMCs are required to refund patronage capital prior to dissolution by each EMC's bylaws. But the appellants' arguments regarding the EMCs' bylaws are only relevant if their complaint sufficiently stated a breach-of-contract claim. And for the reasons set forth in Division 5 (a) *supra*, it did not.

dissolution on some sort of reasonable, rotating basis. But this contention is belied by the plain language of that statute.

We are mindful that, in considering the meaning of a statute, our charge as an appellate court is to "presume that the General Assembly meant what it said and said what it meant."[74] Toward that end, we must afford the statutory text its plain and ordinary meaning,[75] consider the text contextually,[76] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[77] and

---

[74] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (punctuation and citation omitted); *accord Arby's Rest. Grp., Inc. v. McRae*, 292 Ga. 243, 245 (1) (734 SE2d 55) (2012).

[75] *See Deal*, 294 Ga. at 172 (1) (a) ("To that end, we must afford the statutory text its plain and ordinary meaning." (punctuation and citation omitted)); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies). . . .").

[76] *See Arizona v. Inter Tribal Council of Arizona, Inc.*, ___U.S. ___, ___ (II) (B) (133 SCt 2247, 186 LE2d 239) (2013) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *Scherr v. Marriott Int'l, Inc.*, 703 F3d 1069, 1077 (7th Cir. 2013) (Manion, J.) ("In statutory construction cases, we begin with the language of the statute itself and the specific context in which that language is used.") (punctuation and citation omitted).

[77] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397) (2013).

seek to "avoid a construction that makes some language mere surplusage."[78] Simply put, when the language of a statute is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[79]

Turning to the statute at hand, OCGA § 46-3-340 provides:

(a) Each electric membership corporation shall be operated without profit to its members; but the rates, fees, rents, or other charges for electric energy and any other facilities, supplies, equipment, or services furnished by the electric membership corporation shall be sufficient at all times:

> (1) To cover all administrative and operating expenses and the costs of purchased capacity and energy as necessary or desirable for the prudent conduct of its business, and to cover the payments of the principal of and interest on the obligations issued or assumed by the electric membership corporation in the performance of the purposes for which it was organized; and

---

[78] *In the Interest of L.T.*, 325 Ga. App. 590, 592 (754 SE2d 380) (2014) (punctuation omitted); *accord Ga. Transmission Corp. v. Worley*, 312 Ga. App. 855, 856 (720 SE2d 305) (2011).

[79] *Holcomb v. Long*, 329 Ga. App. 515, 518 (1) (765 SE2d 687) (2014) (punctuation omitted); *see Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

(2) To *establish and maintain reasonable reserves*.

(b) An electric membership corporation may also *accumulate funds* for future capital needs and for the purpose of establishing and maintaining a reasonable capital structure.

(c) *The bylaws* of an electric membership corporation *shall contain provisions,* consistent with subsection (a) of this Code section*, for accounting for, allocating, assigning and disposing of its revenues and assets and may establish classes of members for such purposes.*[80]

As evidenced above, the plain language of subsections (a) (2) and (b) expressly permits EMCs to "accumulate funds" beyond those necessary for costs and operating expenses to "maintain reasonable reserves" for future capital needs and "for the purpose of establishing and maintaining a reasonable capital structure." The former-member appellants have not alleged, and we do not find, that those subsections are ambiguous in any respect. Instead, the appellants argue that subsection (c) contains an *implicit* requirement that EMCs refund patronage capital prior to dissolution either when a member terminates his or her account or on a "reasonable" schedule that requires EMCs to refund patronage capital at least 13 years after it was allocated to

---

[80] Emphasis supplied.

a member. But no such specific and detailed requirements for the retirement of patronage capital are contained in subsection (c), implicitly or otherwise.

Contrary to the former-member appellants' contention, the plain and unambiguous language of OCGA § 46-3-340 (c) requires only that the bylaws of each EMC "contain provisions" regarding the accounting for, allocating, assigning, and disposing of revenues. And it sets forth no mandates as to the substance of those provisions. In essence, the appellants ask this Court (or a jury) to create a mandate that EMCs adopt a particular schedule for refunding patronage capital prior to dissolution based solely on the Act's general principles regarding the cooperative and nonprofit nature of EMCs, rather than based on the statutory text itself. We are not at liberty to do so. Although the statute, as written, may seem unfair to the appellants, it is the job of the legislature, not the courts, to rewrite or revise statutes.[81]

Moreover, notwithstanding the appellants' repeated claims to the contrary, the Supreme Court of Georgia has held that "[capital] credits allocated to a patron on the

---

[81] *See Allen v. Wright*, 282 Ga. 9, 12 (1) (644 SE2d 814) (2007) ("[U]nder our system of separation of powers, this Court does not have the authority to rewrite statutes." (punctuation omitted)); *State v. Fielden*, 280 Ga. 444, 448 (629 SE2d 252) (2006) ("The doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced. Under that doctrine, statutory construction belongs to the courts, legislation to the legislature. We can not add a line to the law." (punctuation omitted)).

44

books of a cooperative *do not reflect an indebtedness which is presently due and payable* by the cooperative to such patron."[82] Instead, such credits "represent an interest which will be paid to them at some *unspecified* later date *to be determined by the board of directors.*"[83] Thus, even if the appellants had a private right of action to enforce OCGA § 46-3-340 (which they do not), this Court has no legal basis for granting the relief requested.[84]

---

[82] *Howard v. Eatonton Co-operative Feed Co.*, 226 Ga. 788, 791 (2) (177 SE2d 658) (1970) (emphasis supplied); *see supra* note 3.

[83] *Howard*, 226 Ga. at 791 (2) (emphasis supplied). We note that, as stated in the appellees' supplemental brief, the Eleventh Circuit recently reviewed a similar Alabama statute regulating rural electric cooperatives and rejected the plaintiff's claim that periodic cash payments of "patronage refunds" were required by the statute. *See Caver v. Cent. Alabama Elec. Coop.*, 845 F3d 1135, 1148 (III) (11th Cir. 2017). Similarly to OCGA § 46-3-340, the Alabama statute provided that excess revenues "*shall be distributed* by the cooperative to its members *as, and in the manner, provided in the bylaws*, either as patronage refunds . . . or by way of general rate reductions, or by combination of such methods." *Id.* at 1147 (III) (emphasis in original), *quoting* Ala. Code. § 37-6-20.

[84] The former-member appellants argue that "the ruling below allows an impermissible legal fiction" that permits the EMCs to avoid paying taxes on patronage capital by never refunding such capital prior to dissolution. They further argue that, if an EMC board has absolute discretion to decide when, if ever, to retire patronage capital prior to dissolution, former members, as a practical matter, may not receive a refund of patronage capital during their lifetimes. But while such circumstances are perceived to be inequitable to the appellants as a policy matter, they have abandoned these arguments by failing to cite any legal authority to support them. *See Murphy*, 337 Ga. App. at 223-24 (1) ("Any enumeration of error which is

45

5. In four separate enumerations of error, the former-member appellants argue the trial court erred in finding that they failed to state a claim for breach of contract, unjust enrichment, money had and received, conversion, declaratory relief, and injunctive relief. Yet again, we disagree.

We begin by reiterating that "[w]e review de novo a trial court's determination that a pleading fails to state a claim upon which relief can be granted, treating all material allegations set forth in the complaint as true, treating all denials set forth in the answer as false, and resolving any doubts in favor of the plaintiff."[85] And in Georgia, "it is not necessary for a complaint to set forth all of the elements of a cause of action in order to survive a motion to dismiss for failure to state a claim."[86] Instead, the Georgia Civil Practice Act "requires only notice pleading and, under the Act, pleadings are to be construed [forgivingly] and reasonably to achieve substantial

---

not supported in the brief by citation of authority or argument may be deemed abandoned." (punctuation omitted)); *Ware*, 327 Ga. App. at 251 (3) (declining to address a claim of error when appellant failed "to provide any cogent argument or citation of authority").

[85] *Campbell*, 338 Ga. App. at 383; *accord Sherman v. Fulton Cty. Bd. of Assessors*, 288 Ga. 88, 89 (701 SE2d 472) (2010).

[86] *Campbell*, 338 Ga. App. at 384 (punctuation omitted); *accord Babalola v. HSBC Bank, USA, N.A.*, 324 Ga. App. 750, 752 (2) (751 SE2d 545) (2013).

justice consistent with the statutory requirements of the Act."[87] In other words, a motion to dismiss for failure to state a claim "should not be granted unless the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof."[88] In this matter, even if the former-member appellants' claims were not also time-barred, they have failed to state a valid claim against their former EMCs for the reasons that follow.

(a) *Breach of contract*

As an initial matter, and as explained in Division 2 (a) *supra*, the former-member appellants lack standing to bring a breach-of-contract claim against Oglethorpe, GTC, and any of the 38 distribution EMCs of which they were never a member. Here, the named plaintiffs are former members of Walton, Cobb, Sawnee, and Jackson EMCs.[89] Thus, to the extent that the appellants can still be considered to

---

[87] *Campbell*, 338 Ga. App. at 384-85 (punctuation omitted); *accord Babalola*, 324 Ga. App. at 752 (2).

[88] *Campbell*, 338 Ga. App. at 385 (punctuation omitted); *accord Babalola*, 324 Ga. App. at 752 (2).

[89] Although Philip Caltabiano, a former member of Cobb EMC, is named as a plaintiff in the complaint, we note that, according to the complaint, Caltabiano has already reached a settlement with Cobb EMC regarding the repayment of patronage

be parties to the bylaws of the EMC of which they were, but are no longer members, we consider whether their complaint sufficiently alleged a breach-of-contract claim as to those distribution EMCs only.

In Georgia, the elements for a breach-of-contract claim are "the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken."[90] And a breach occurs if a contracting party, *inter alia*, "fails to perform the engagement as specified in the contract[.]"[91] As previously mentioned, the former-member appellants alleged that each EMC's bylaws "constitute a contract between [the EMC] and its members" and that the defendant EMCs "breached the contractual obligations in their bylaws by failing to return the patronage capital resulting from their excess earnings owned by their former members upon termination of membership or within a reasonable time after services [are] terminated." In addition, the appellants alleged that the EMCs breached the contractual obligation in

capital in a separate class action.

[90] *UWork.com, Inc. v. Paragon Techs., Inc.*, 321 Ga. App. 584, 590 (1) (740 SE2d 887) (2013) (punctuation omitted); *accord Canton Plaza, Inc. v. Regions Bank, Inc.*, 315 Ga. App. 303, 306 (1) (732 SE2d 449) (2012).

[91] *UWork.com, Inc.*, 321 Ga. App. at 590 (1) (punctuation omitted); *accord Shiho Seki v. Groupon, Inc.*, 333 Ga. App. 319, 322 (1) (775 SE2d 776) (2015).

their bylaws "by failing to adopt reasonable policies and procedures to periodically retire patronage capital resulting from their excess earnings for the benefit of all members and former members."

But the former-member appellants have never, and do not now, claim that any particular provision in the EMCs' bylaws expressly mandates that the EMCs refund patronage capital at the time when a member terminates his or her account or after any specified length of time thereafter. Instead, they alleged that by failing to periodically refund patronage capital on a "reasonable" schedule of no more than 13 years following allocation, the EMCs breached a more general promise to "operate on a nonprofit cooperative basis for the mutual benefit of the members who are their customers." Put another way, they claimed that "[t]he obligation to allocate and return patronage capital to the members and former members is reflected in the [EMCs'] bylaws *through their embrace of cooperative principles . . . .*"[92]

Notwithstanding the former-member appellants' interpretation of what the term "cooperative principles" means or requires of EMCs, we have held that "when a provision specifically addresses the issue in question, it prevails over any conflicting

---

[92] Emphasis supplied.

general language."[93] And here, the bylaws of Walton, Jackson, and Sawnee EMCs contained specific provisions addressing the allocation and retirement of patronage capital, which do not require the board of directors of each EMC to refund patronage capital at any particular time or on any "reasonable" schedule prior to dissolution of the cooperative.[94] For example, in Walton EMC's bylaws, Section 9.02 is entitled

---

[93] *Avion Sys., Inc. v. Thompson*, 293 Ga. App. 60, 63 (2) (a) (666 SE2d 464) (2008) (punctuation omitted); *accord Woody's Steaks, LLC v. Pastoria*, 261 Ga. App. 815, 818 (1) (584 SE2d 41) (2003); *see Mayor, etc., of Savannah v. Savannah Elec. & Power Co.*, 205 Ga. 429, 436-37 (54 SE2d 260) (1949) ("[When] there is in the same statute a specific provision, and also a general one which in its most comprehensive sense would include matters embraced in the former, the particular provision must control, and the general provision must be taken to affect only such cases within its general language as are not within the provisions of the particular provision." (punctuation omitted)).

[94] The five named EMC defendants filed an amendment to their answers and attached numerous amended versions of their bylaws, which were considered by the special master and the trial court. While considering matters outside the pleadings generally converts a motion to dismiss into a motion for summary judgment, a trial court "may properly consider exhibits attached to and incorporated in the pleadings in considering a motion to dismiss for failure to state a claim for relief." *Hendon Props., LLC v. Cinema Dev., LLC*, 275 Ga. App. 434, 435 (620 SE2d 644) (2005); *see Stendahl v. Cobb Cty.*, 284 Ga. 525, 526 (1) n.2 (668 SE2d 723) (2008) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes and, if incorporated into the pleadings, may be considered when deciding a motion to dismiss for failure to state a claim without converting the motion into one for summary judgment." (punctuation and citation omitted)). Thus, because the bylaws at issue were attached to and incorporated into amended *pleadings*, the trial court was permitted to consider them, and the former-member appellants do not argue otherwise.

"Patronage Capital in Connection with Furnishing Electric Energy[,]" and requires only that the EMC "pay credits to a capital account for each patron all such amounts in excess of operating costs and expenses[,]" and to "notify each patron of the amount of capital so credited to his/her account" within a reasonable time after the close of each fiscal year. In addition, Section 9.02 provides that in the event of dissolution or liquidation, all

> outstanding capital credits shall be retired without priority on a pro rata basis . . . [,]" and that, "[*i*]*f* at any time prior to dissolution or liquidation, the [b]oard of [d]irectors shall determine that the financial condition of the [c]ooperative will not be impaired thereby, the capital credited to patrons' accounts *may* be retired in full or in part.[95]

And finally, Walton EMC's bylaws suggest there may not be any pre-dissolution retirement of patronage capital by providing that the board of directors "shall determine the method of allocation, basis, priority, and order of retirement, *if any*."[96]

---

[95] Emphasis supplied.

[96] Emphasis supplied. A review of Jackson and Sawnee EMCs' bylaws shows that they contain substantially similar provisions regarding the allocation and retirement of patronage capital, which, like Walton EMC's bylaws, require the allocation of such capital to its members' accounts and that it be refunded upon dissolution or liquidation, but grants the board of directors the *discretion* to refund patronage capital prior to dissolution. Because it appears to be undisputed that the provisions of Walton EMC's bylaws are adequately representative of the bylaws of

The specific provisions regarding the allocation and retirement of patronage capital unambiguously provide that the only time when Walton EMC's board of directors is *required* to refund patronage capital is at the time of dissolution or liquidation,[97] but that its board of directors *may* (but is not required to) do so at other times under certain conditions. Given these particular circumstances, the specific provisions in the EMCs' bylaws granting the board of directors the *discretion* to refund patronage capital prior to dissolution *if* it chooses to do so controls over any *general* promise in the bylaws to operate pursuant to "cooperative principles."[98] And

the other named EMCs, we need not address each of them separately.

[97] Under a principle of contract construction, *expressio unius est exclusio alterius* or "the express mention of one thing implies the exclusion of another," the fact that the EMCs' bylaws expressly require patronage capital to be refunded in the event of dissolution or liquidation necessarily implies that there are no other times when an EMC is *required* to refund patronage capital, including, as the appellants suggest, when a member terminates his or her account. *See Miller Cty. Bd. of Ed. v. McIntosh*, 326 Ga. App. 408, 413 (756 SE2d 641) (2014) (recognizing a "principle of construction (applicable to statutes and contracts alike), 'expressio unius est exclusio alterius,' or '[t]he express mention of one thing implies the exclusion of another'") (punctuation omitted)); *Krogh v. Pargar, LLC*, 277 Ga. App. 35, 39 (2) (625 SE2d 435) (2005) (same).

[98] *See supra* note 93 & accompanying text ; *see also Carnett's Props., LLC v. Jowayne, LLC,* 331 Ga. App. 292, 294 (771 SE2d 5) (2015) ("The cardinal rule of contract construction is to ascertain the intention of the parties. If the terms of a contract are plain and unambiguous, the contractual terms alone determine the parties' intent." (punctuation omitted)); *Megel v. Donaldson*, 288 Ga. App. 510, 513

52

significantly, the bylaw provisions regarding such allocation are consistent with our Supreme Court's characterization of patronage capital in *Howard* discussed in Division 4 *supra.*[99]

Nevertheless, while the former-member appellants appear to concede that each EMC's board of directors has discretion regarding when to refund patronage capital prior to dissolution, they argue that the EMC boards have breached their duty to exercise such discretion in good faith. But although every contract "implies a covenant of good faith and fair dealing in the contract's performance and enforcement[,] . . . the covenant cannot be breached apart from the contract provisions it modifies and therefore cannot provide an independent basis for liability."[100] As a result, the appellants cannot maintain a claim for the breach of the covenant of good

---

(1) (654 SE2d 656) (2007) ("[N]o construction [of a contract] is required or even permitted when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation." (punctuation omitted)).

[99] *See supra* notes 82-83 & accompanying text.

[100] *McGee v. Patterson*, 323 Ga. App. 103, 112 (5) (746 SE2d 719) (2013) (punctuation omitted); *see Ameris Bank v. All. Inv. & Mgmt. Co., LLC*, 321 Ga. App. 228, 233-34 (3) (a) (739 SE2d 481) (2013) ("[T]here can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." (punctuation omitted)).

faith and fair dealing because they have not alleged a viable claim for breach of contract.[101]

---

[101] *See Secured Realty Inv. v. Bank of N. Ga.*, 314 Ga. App. 628, 630 (1) (b) (725 SE2d 336) (2012) (holding that the plaintiffs could not sustain a claim for a breach of the implied covenant of good faith and fair dealing when they failed to show that the defendants had a contractual obligation underlying the claim); *WirelessMD, Inc. v. Healthcare.com Corp.*, 271 Ga. App. 461, 468-69 (2) (610 SE2d 352) (2005) (holding that a defendant was entitled to summary judgment as to claims that it violated an implied covenant of good faith and fair dealing by not adequately marketing a product when the defendant had no contractual duty, either express or implied, to market the product). We acknowledge the former-member appellants' argument that this Court has held that when an agreement gives a party discretionary decision-making authority, those decisions must be made in good faith, which means the decision was "not made for arbitrary or capricious reasons, was based on an improper pecuniary motive, or was predicated on dishonesty or illegality." *Planning Techs., Inc. v. Korman*, 290 Ga. App. 715, 718, 720 (660 SE2d 39) (2008); *see, e.g., Rigby v. Boatright*, 330 Ga. App. 181, 184-85 (1) (767 SE2d 783) (2014); *Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 281 Ga. App. 450, 451-53 (1) (636 SE2d 139) (2006). Nevertheless, our Supreme Court, after acknowledging that principle of law, has clarified that "[t]here can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." *Automatic Sprinkler Corp. of Am. v. Anderson*, 243 Ga. 867, 868 (257 SE2d 283) (1979). And here, the bylaws expressly gave the board of directors of each EMC the right to *retain* and use patronage capital for its own purposes, rather than issuing refunds, except upon dissolution or liquidation. The EMCs' bylaws contain no legal obligation for them to forego that right merely for their members' financial gain. *See, e.g., Griffin v. State Bank of Cochran*, 312 Ga. App. 87, 96-97 (2) (b) (718 SE2d 35) (2011) (rejecting the defense of a breach of the implied duty of good faith and fair dealing when, as here, the party asserting the claim failed to identify any provision in the contract that the other party failed to perform in good faith).

(b) *Unjust Enrichment and Money Had and Received*

The former-member appellants next challenge the trial court's dismissal of their claims for unjust enrichment and money had and received. Specifically, they argue that the trial court erred in finding that (1) such claims only arise in the absence of a contract; (2) the appellants were required to allege that they conferred a direct benefit on Oglethorpe and GTC; and (3) the retention of patronage capital by Oglethorpe and GTC was not unjust or inequitable because those EMCs were entitled to retain such funds under the EMC Act.

Nevertheless, as explained by the Supreme Court of Georgia, "[u]njust enrichment applies when as a matter of fact there is *no legal contract*, but where the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefit[t]ed party equitably ought to return or compensate for."[102] Further, to state a claim for money had and received, a plaintiff must allege that "a person has received money of the other that in equity and good conscience he should not be permitted to keep; demand for repayment has been made;

---

[102] *Engram v. Engram*, 265 Ga. 804, 807 (2) (463 SE2d 12) (1995) (punctuation omitted) (emphasis supplied); *accord Rommelman v. Hoyt*, 295 Ga. App. 19, 20 (670 SE2d 808) (2008).

and the demand was refused."[103] And similarly to unjust enrichment, a claim for money had and received "exists only where there is no actual legal contract governing the issue."[104]

As to the former-member appellants' unjust-enrichment claim, the complaint alleged that the defendant EMCs were retaining property belonging to them—*i.e.*, patronage capital allocated to them on the EMCs' books. Similarly, the appellants' money-had-and-received claim was based on an allegation that the EMCs have wrongfully retained patronage capital after they terminated their accounts that should be refunded to them. Importantly, they claimed that the EMCs were bound to refund patronage capital "*by contract* and state and federal law."[105]

But the former-member appellants paid no money (and conferred no benefit) to any EMC other than the distribution EMC from which they formerly purchased

---

[103] *Fernandez v. WebSingularity, Inc.*, 299 Ga. App. 11, 13 (2) (681 SE2d 717) (2009) (punctuation omitted); *see Taylor v. Powertel, Inc.*, 250 Ga. App. 356, 359 (2) (551 SE2d 765) (2001) ("Under the common law doctrine of money had and received, recovery is authorized against one who holds unspecified sums of money of another which he ought in equity and good conscience to refund.").

[104] *Fernandez*, 299 Ga. App. at 13-14 (2) (punctuation omitted); *accord McGonigal v. McGonigal*, 294 Ga. App. 427, 428 (2) (669 SE2d 446) (2008).

[105] Emphasis supplied.

electricity. Moreover, to establish their entitlement to a refund of patronage capital, the appellants rely only on a statute, under which they have no private right of action, and the EMCs' bylaws, which they expressly alleged are *contracts* between each EMC and its members. Furthermore, as discussed at length *supra*, the EMC statute, the EMCs' bylaws, and the Supreme Court of Georgia's decision in *Howard* all establish that an EMC's board of directors is not required to refund patronage capital at any time other than upon dissolution or liquidation. Indeed, although the appellants claim that they *own* the patronage capital being retained by the EMCs, our Supreme Court has explained that allocations of capital credits merely reflect a member's ownership *interest* in such retained capital, not an indebtedness of a cooperative that is presently due and payable to the members.[106] Under such circumstances, the former-member appellants' complaint failed to state a claim for unjust enrichment or for money had and received.[107]

---

[106] *See Howard*, 226 Ga. at 791-92 (2).

[107] *See Rommelman*, 295 Ga. App. at 20-21 (holding that a claim for unjust enrichment failed when the plaintiff conferred no benefit upon the defendant); *Tidikis v. Network for Med. Commc'ns. & Research LLC*, 274 Ga. App. 807, 811 (2) (619 SE2d 481) (2005) (holding that an unjust-enrichment claim failed as a matter of law when any benefit conferred on the defendants was triggered by a contract provision, the validity of which was not challenged); *Bonem v. Golf Club of Ga.*, 264 Ga. App. 573, 578-79 (3) (591 SE2d 462) (2003) (holding that the plaintiff was entitled to

(c) *Conversion*

As previously explained in Division 3 *supra*, the former-member appellants' conversion claim relates to specific transactions that occurred between 1990 and 1997, and, as a result, are barred by a four-year statute of limitations.[108]

(d) *Injunctive and Declaratory Relief*

The former-member appellants also argue the trial court erred by dismissing their claims for declaratory and injunctive relief. But they have abandoned any challenge to the dismissal of their claim for injunctive relief by failing to cite to any legal authority to support it.[109] As to their claim for declaratory relief, Georgia's Declaratory Judgment Act is to be construed forgivingly, and "all that is required to state a claim for declaratory judgment is the presence in the declaratory action of a

---

summary judgment on defendant's counterclaim for unjust enrichment where the dispute governed by legal contract); *Eastside Carpet Mills, Inc. v. Dodd*, 144 Ga. App. 580, 580 (241 SE2d 466) (1978) ("Logically, . . . when one sues for money had and received for his use, he must prove that the money was his own." (punctuation omitted)).

[108] *See* OCGA § 9-3-32 ("Actions for the recovery of personal property, or for damages for the conversion or destruction of the same, shall be brought within four years after the right of action accrues . . . .").

[109] *See supra* note 57.

party with an interest in the controversy adverse to that of the petitioner."[110] Nevertheless, when the party seeking declaratory judgment "does not show it is in a position of uncertainty as to an alleged right, dismissal of the declaratory judgment action is proper . . . ."[111] Otherwise, the trial court would be issuing an advisory opinion, and "the Declaratory Judgment Act makes no provision for a judgment that would be 'advisory.'"[112]

Turning to the claim at issue, the former-member appellants alleged that declaratory relief was necessary to resolve outstanding uncertainties regarding the EMCs' duties imposed by OCGA § 46-3-340

> to satisfy their obligations and set rates at a level sufficient to redeem their patronage capital obligations, [the appellants'] ownership of that patronage capital, [the EMCs'] obligation to redeem or refund that patronage capital, and [the EMCs'] compliance with the mandate that they operate as nonprofits, at cost, and in accordance with the user-ownership principle.

---

[110] *Mariner Healthcare, Inc. v. Foster*, 280 Ga. App. 406, 410 (3) (a) (634 SE2d 162) (2006) (punctuation omitted).

[111] *Walker v. Owens*, 298 Ga. 516, 519 (783 SE2d 114) (2016) (punctuation omitted) (quoting *Baker v. City of Marietta*, 271 Ga. 210, 214 (1) (518 SE2d 879) (1999)).

[112] *Walker*, 298 Ga. at 519 (punctuation omitted) (quoting *Baker*, 271 Ga. at 214 (1)).

But as explained in Divisions 2 (b) and 4 *supra*, the former-member appellants have no private right of action to enforce the requirements of OCGA § 46-3-340, and even if they did, that statute does not mandate that an EMC refund patronage capital at any particular time or on any set schedule prior to dissolution or liquidation. And it certainly does not contain specific mandates—as the appellants allege in their complaint—that an EMC "charge and collect current member rates that are sufficient to cover refunds of patronage capital to members upon termination of service (or by the next accounting period thereafter) or, at a minimum, on a 13-year revolving cycle from the date of allocation."[113] Thus, because the appellants have no right to a refund of patronage capital at any particular time prior to dissolution under the EMC Act and the EMCs' bylaws, they have failed to allege that they are in a position of uncertainty as to an alleged right. Under such circumstances, the trial court properly dismissed the appellants' claim for declaratory relief.[114]

---

[113] *See* OCGA § 46-3-340; Division 4 *supra.*

[114] *See Capitol Infrastructure, LLC v. Plaza Midtown Residential Condo. Ass'n, Inc.*, 306 Ga. App. 794, 799 (1) (702 SE2d 910) (2010) (holding that when the statutory period allowed for a plaintiff to enforce a right to terminate certain contracts, the plaintiff's right to do so also expired, and it was not entitled to a declaratory judgment because there was no uncertainty regarding that alleged right); *Adams v. Atlanta Cas. Co.*, 225 Ga. App. 482, 484 (1) (484 SE2d 302) (1997) ("When a declaratory judgment cannot guide and protect the petitioner regarding a future act,

6. Finally, the former-member appellants argue the trial court erred in finding that the filed-rate doctrine prohibits courts from imposing "a different rate than the one approved by a regulatory agency when the agency has primary rate-making authority." But given our holdings in Divisions 2 through 5 *supra* (*i.e.*, that the appellants failed to state a claim entitling them to a refund of patronage capital, that their claims are time-barred, and that they lack standing as to all EMCs except the one of which they were a member), we need not address whether a court is authorized to impose a different rate on the EMCs' current customers to enable the EMCs to make such refunds.

## *Case No. A17A0385*

7. In their first enumeration of error, the current-member appellants argue the trial court erred in concluding "that [the] defendants have absolute discretion to never retire patronage capital, except upon dissolution." But similarly to the former-member appellants' argument, this contention is entirely based on an alleged duty to periodically refund patronage capital arising from OCGA § 46-3-340 and the bylaws of each EMC. And given our holdings in Divisions 2(b), 4, and 5 (a) *supra*, this argument is without merit. Moreover, while the current-members set forth their

no declaratory judgment is authorized.").

proposed construction of OCGA § 46-3-340 and contend that expert testimony is needed to explain a "term of art" in the statute, they fail to address the threshold matter of whether they have a private right of action to enforce the provisions of OCGA § 46-3-340, which, as explained *supra*, they do not.

As to the requirements of the EMCs' bylaws regarding patronage capital, the current-member appellants, like the former-member appellants, rely on general concepts regarding the "cooperative principles" governing EMCs, which, as previously explained, are not controlling in light of the specific provisions in each of the bylaws addressing the allocation and retirement of patronage capital.[115] Although they do not reference any of these specific provisions in the argument section of their brief, their complaint quoted excerpts from Oglethorpe and Walton EMCs' bylaws. But those provisions are consistent with the ones set forth in Division 5 (a) *supra*, mandating that, "[i]n order to induce patronage and to assure that the [c]ooperative will operation on a non-profit basis[,]" EMCs are "*obligated* to pay [ ] credits *to a capital account* for each patron all such amounts in excess of operating costs and expenses[,]" but providing that, under certain financial conditions prior to dissolution or liquidation, an EMC's board of directors "*may* be retired in full or in part." Thus,

---

[115] *See supra* note 93 & accompanying text.

62

by the current-members' own admission, the bylaw provisions specifically addressing patronage capital only mandate that patronage capital be *allocated* to a *capital account*, but an EMC's board of directors has discretion as to when and whether to actually retire some or all of that patronage capital, as it *may* do so under certain financial conditions.

Finally, the current-member appellants argue that the Supreme Court of Georgia's decision in *Howard*[116] supports their position that patronage capital must be refunded periodically prior to dissolution or liquidation of an EMC because the *Howard* Court noted that patronage capital "will be paid" to EMC members. But *Howard* also explained that "[r]edemption of patronage allocations is a matter within the discretion of the directors of the cooperative[,]"[117] and while such allocations "reflect an ownership *interest* of the patron in such retained capital[,] . . . [e]quity credits are *not* an indebtedness of a cooperative which is *presently due and payable* to the members[.]"[118] Instead, such credits "will be paid to them at some *unspecified*

---

[116] *See supra* note 82.

[117] *Howard*, 226 Ga. at 791 (2).

[118] *Id.* at 792 (2) (emphasis supplied).

*later date* to be *determined by the board of directors.*"[119] Furthermore, it is worth noting that *Howard* was decided in 1970 under a previous version of the EMC Act, which provided that revenues not required for, *inter alia*, the operation and maintenance expenses of an EMC "*shall* be returned from *time to time* to the members on a pro rata basis according to the amount of business done with each during the period, either in cash, in abatement of current charges for electric energy, or otherwise as the board determines . . . ."[120] But as detailed above, the current version of the statute omits any mandate that patronage capital be refunded "from time to time."[121] Thus, we must presume that the General Assembly's omission of the language periodically requiring the return of patronage capital—the very requirement that the appellants seek for us to impose—was a matter of considered choice.[122]

---

[119] *Id.* (emphasis supplied).

[120] *Lamar Elec. Membership Corp. v. Carroll*, 89 Ga. App. 440, 453 (1) (79 SE2d 832) (1953) (quoting pre-1987 version of OCGA § 46-3-340 (emphasis supplied) (physical precedent only)); *see* 1937 Ga. Laws 644-59.

[121] *See* OCGA § 46-3-340 (c); *Transp. Ins. Co. v. El Chico Rests., Inc.*, 271 Ga. 774, 776 (524 SE2d 486) (1999) ("[U]nder the rules of statutory construction, the omitted language cannot be deemed a redundancy or meaningless surplusage.").

[122] *See Gwinnett Cty. Sch. Dist. v. Cox*, 289 Ga. 265, 296 (II) (A) (2) n.18 (710 SE2d 773) (2011) (noting that "the presumption is that, when limiting language is removed from a law, the law should no longer be read as including such limits"); *El*

8. Next, the current-member appellants argue the trial court erred in finding that they lacked standing to sue the wholesale EMCs, Oglethorpe, and GTC. And while the current-member appellants do not dispute that they are not now, nor have they ever been, members of Oglethorpe and GTC,[123] they nevertheless argue that they have standing to sue those entities because they alleged that they have a "personal stake in the outcome." But the appellants do not elaborate on that conclusory statement, and the only legal authority they cite to for this proposition is a Supreme Court of the United States opinion, in which the Court noted that it was of "critical importance to the standing inquiry" that Congress had statutorily authorized the type of action at issue.[124] And only after concluding that the lawsuit was authorized by

---

*Chico Rests.*, 271 Ga. at 776 (holding that the legislature's deletion of limiting language when amending a statute must be presumed to be "a matter of considered choice" so that the law cannot be read to maintain the limitation at issue). *Cf. A.A. Prof'l Bail v. Perdue*, 306 Ga. App. 72, 73 (1) (701 SE2d 542) (2010) ("We . . . presume that the legislature intended to make a change to the pre-existing substantive law when it adds sentences to a statute.").

[123] The current-member appellants' complaint asserted that they brought this class action "on behalf of the current members of the 38 Georgia cooperatives that are members of Oglethorpe and GTC." Thus, the appellants represent members of distributive, not wholesale, EMCs.

[124] *See Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (IV) (127 SCt 1438, 167 LE2d 248) (2007).

65

statute did the Supreme Court address the issue of whether the plaintiffs had a personal stake in the outcome.[125] To the extent that the appellants have not abandoned this argument on appeal by failing to develop any cogent argument, we note that an action to recover patronage capital has not been statutorily authorized in Georgia.

Nevertheless, the current-member appellants also argue that they have standing because (1) the distribution EMCs act as their agents in purchasing electricity from the wholesale EMCs; (2) they are third-party beneficiaries of the contracts (bylaws) between the wholesale and distribution EMCs; and (3) neither unjust enrichment nor conspiracy require any privity between them and the wholesale EMCs. But we reject these arguments for the same reasons given in Divisions 2 (c), 2 (e), 2 (f) and 5 (b).

9. In five separate enumerations of error, the current-member appellants also argue the trial court erred in finding that they failed to state claims for breach of contract, violation of the covenant of good faith and fair dealing, unjust enrichment, money had and received, conversion, conspiracy, and declaratory and injunctive relief. We disagree.

---

[125] *See id.*

(a) *Breach of Contract*

The current-member appellants first contend their complaint alleged that the EMCs have breached their bylaws by failing to distribute patronage capital and the court erred by dismissing this claim because there is a contested factual issue regarding the EMCs' contractual duty to distribute such capital. But we have held that "[c]ontract disputes are particularly well suited for adjudication by summary judgment because construction of contracts is ordinarily a matter of law for the court."[126] And although this case was decided at the pleading stage, rather than on summary judgment, the trial court was authorized to consider the contracts at issue, which were attached and incorporated into the defendants' amended answers.[127] It is undisputed that those bylaws are authentic and representative of the bylaws of all of the EMCs. Thus, for the same reasons given in Division 5 (a) *supra*, the EMCs'

---

[126] *Core LaVista, LLC v. Cumming*, 308 Ga. App. 791, 794 (1) (a) (709 SE2d 336) (2011) (punctuation omitted); *see* OCGA § 13-2-1 ("The construction of a contract is a question of law for the court. Where any matter of fact is involved, the jury should find the fact."); *Hendon Props., LLC*, 275 Ga. App. at 435-38 (1) (affirming the trial court's dismissal of specific performance and breach-of-contract claim when the trial court properly considered the contract at issue was attached as an exhibit to the amended complaint and determined that it was unenforceable as a matter of law).

[127] *See supra* note 94.

bylaws do not impose a duty to refund patronage capital at any particular time other than upon dissolution or pursuant to any particular "reasonable" schedule, and the trial court did not err in dismissing the appellants' breach-of-contract claim at the pleading stage.

(b) *The Implied Duty of Good Faith and Fair Dealing*

The current-member appellants also argue the trial court erred in finding that they failed to state a claim for a breach of the covenant of good faith and fair dealing because, even if the EMCs' boards of directors have discretion regarding when to refund patronage capital, Georgia courts "do not deem grants of discretion absolute in the absence of clear language to that effect . . . ." Nevertheless, the appellants have failed to establish that any EMC had an express or implied duty under its bylaws to refund patronage capital at any particular time prior to dissolution, and as a result, it cannot show that the EMCs acted in bad faith by failing to do so.[128]

(c) *Unjust Enrichment*

Next, the appellants contend the trial court erred in concluding that they failed to state a claim for unjust enrichment. Specifically, they argue that the trial court erroneously concluded they were precluded from pleading both a breach-of-contract

---

[128] *See supra* Division 5 (a); notes 100-01 & accompanying text.

claim and an unjust-enrichment claim. But the trial court did not find that the current-member appellants were generally precluded from pleading alternative theories of recovery. Instead, it found that their unjust-enrichment claim failed because they contend that the bylaws constitute an enforceable contract between the parties.

And as previously explained in Division 5 (b) *supra*, "[u]njust enrichment applies when as a matter of fact there is *no legal contract*, but where the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefit[t]ed party equitably ought to return or compensate for."[129] Here, the only alleged "benefit" that was conferred on the EMCs from the appellants was the money that each consumer paid only to the EMC of which they were a member to purchase electricity, and they claim a portion of those payments are patronage capital that is being unjustly retained by the EMCs. But it is undisputed that each EMC's bylaws contain express provisions governing the retirement of patronage capital, and even if not, the EMCs' retention of patronage capital is not inequitable or unjust because, again, as explained *supra*, such capital is not an indebtedness that is immediately due and payable to its members. Under such

---

[129] *Engram*, 265 Ga. at 807 (2) (punctuation omitted) (emphasis supplied); *accord Rommelman*, 295 Ga. App. at 20.

circumstances, the trial court did not err in concluding that they failed to state a claim for unjust enrichment.[130]

(d) *Money Had and Received*

The current-member appellants further argue the trial court erred in dismissing their money-had-and-received claim for failure to state a claim based on its conclusion that such a claim is only viable in the absence of a contract. But for the reasons given in Division 5 (b) *supra*, the trial court was correct that a claim for money had and received "exists only where there is no actual legal contract governing the issue."[131] In contending otherwise, the appellants rely primarily on our decision in *McGonigal v. McGonigal*,[132] in which the plaintiff was allowed to pursue a claim against his ex-wife for money had and received even though the payment he made was pursuant to their divorce settlement agreement.[133] In *McGonigal*, however, there was no specific provision in the settlement agreement governing the dispute at

---

[130] *See supra* Division 5 (b), note 107.

[131] *Fernandez*, 299 Ga. App. at 13-14 (2) (punctuation omitted); *accord Vernon v. Assurance Forensic Accounting, LLC*, 333 Ga. App. 377, 388 (2) n.8 (774 SE2d 197) (2015).

[132] 294 Ga. App. 427.

[133] *See id.* at 430 (2).

issue.[134] But here, the appellants' complaint repeatedly alleged and the record showed that the EMCs' bylaws contain provisions governing the allocation and repayment of patronage capital, and thus, we apply the general rule that a claim for money had and received is a theory that may only be brought in the absence of a legal contract governing the issue.[135]

(e) *Conversion*

Next, the current-member appellants argue the trial court erred in dismissing their claim for conversion. But like the former-member appellants' conversion claim, the instant claim arises from transactions that occurred in the 1990s. And because the current-member appellants did not bring their conversion claim until 2014, it is time-barred for the same reasons given in Division 3 *supra*.

(f) *Conspiracy*

The current-member appellants argue the trial court erred in dismissing their conspiracy claim based on a finding that such claims can only be brought based on tortious conduct but not breach of contract. In their complaint, the appellants asserted

---

[134] *See id.*

[135] *See e.g.*, *Baghdady v. Cent. Life Ins. Co.*, 224 Ga. App. 170, 171 (2) (480 SE2d 221) (1996) ("Since a legal contract, in this case an insurance contract, existed here, the theory of money had and received is not applicable to these facts.").

71

generally that the EMC defendants "conspired with one another to violate their promise to operate as cooperatives" and to "unlawfully maintain possession and control of [appellants'] patronage capital and have used this money for their own purposes. But as the trial court found, and as explained more fully in Division 2 (c) *supra*, "[a]bsent [an] underlying *tort*, there can be no liability for civil conspiracy."[136] And while it is true that "a single act or course of conduct may constitute not only a breach of contract but an independent tort as well,"[137] a plaintiff must still show that, in addition to breaching a contractual obligation, the defendant "also violate[d] a duty owed to [the] plaintiff *independent* of [the] contract to avoid harming him."[138] In other words, "to constitute a tort the duty must arise independent of the contract."[139] And for the reasons given herein, the appellants have failed to identify such an

---

[136] *Hartsock*, 279 Ga. App. at 726 (2) (punctuation omitted).

[137] *Sheppard v. Yara Eng'g Corp.*, 248 Ga. 147, 148 (281 SE2d 586) (1981) (punctuation omitted).

[138] *Id.* (punctuation omitted) (emphasis supplied).

[139] *Id.*; *see also ServiceMaster Co., L.P. v. Martin*, 252 Ga. App. 751, 754 (2) (556 SE2d 517) (2001) ("It is well settled that mere failure to perform a contract does not constitute a tort. A plaintiff in a breach of contract case has a tort claim only where, in addition to breaching the contract, the defendant also breaches an independent duty imposed by law." (footnote omitted)).

72

independent duty. Nevertheless, appellants argue that, even if a conspiracy claim requires an underlying tort, they alleged conspiracy with respect to the tort of conversion. But this argument is unavailing because, as explained in Divisions (3) and 9 (e) *supra*, their conversion claim has long been time-barred.

(g) *Declaratory and Injunctive Relief*

The current-member appellants also argue the trial court erred in dismissing their claim for injunctive relief, which requested "an immediate distribution of long-accumulated patronage capital credits to [c]lass members[,]" as well as their claim for declaratory relief, which sought to require the EMCs to distribute patronage capital "according to a regular, reasonable revolving plan." But although the appellants' two amended complaints reference their original complaint as one for "declaratory[,] injunctive, and mandamus relief and damages" and listed such relief generally as one of their prayers for relief, none of the complaints alleged a separate count setting forth a specific claim for such relief. And on appeal, while they assert their entitlement to the declaratory and injunctive relief set forth above, they cite only a single case to support that contention and do not elaborate on how that legal authority supports their

position.[140] Nevertheless, to the extent that the appellants have not abandoned this argument on appeal, their complaints failed to state claims for injunctive and declaratory relief for the reasons discussed in Division 5 (d) *supra*.

10. Finally, the current-member appellants argue the trial court erred in finding that their claims against the distribution EMCs are derivative and must be dismissed because the appellants failed to comply with the pre-suit derivative-claim requirements of OCGA § 46-3-272 (a) and (b).[141] Specifically, they claim that general reasons for requiring a derivative suit, such as to avoid multiplicity of lawsuits, are inapplicable in this case. And they allege their claims cannot be derivative insofar as they seek a refund of the patronage capital already held by the distribution EMCs. Nevertheless, even if that were true, they have failed to state any claims for relief,

[140] The appellants cite to *Bd. of Comm'rs of Spalding Cty. v. Stewart*, 284 Ga. 573 (668 SE2d 644) (2008), a case in which the Supreme Court of Georgia held that the requested injunction was warranted in the absence of a legal remedy and that the injunction was not overbroad. *See id.* at 575 (3). But other than the fact that the case involved a request for injunctive relief, it bears no resemblance to the facts and circumstances of the instant case or the particular relief requested by the appellants.

[141] Although the current-member appellants do not appear to expressly challenge the trial court's finding that their claims against the *wholesale* EMCs are derivative, they do argue that recovery from the distribution EMCs only would not adequately compensate them and that they seek a "direct refund" of patronage capital currently held by the wholesale EMCs.

derivative or otherwise, against the distribution EMCs of which they are members, and they lack standing to sue the remaining EMC defendants.[142]

For all these reasons, we affirm the trial court's dismissal order in both of the consolidated appeals.

*Judgments affirmed. Ray and Self, JJ., concur.*

---

[142] *See generally* Divisions 2, 8, and 9 herein.